SIDNEY C. COZINE, Appellee, v. W. N. MOORE, Appellant.

**Physicians:** MALPRACTICE: EVIDENCE. The evidence in this action for
1    malpractice in treating a compound fracture of plaintiff's lower jaw is reviewed at length and held insufficient to establish negligence in the manner of treatment, or want of skill on the part of defendant. The mere fact that defendant adopted one recognized method of treatment where other physicians might have adopted another does not show negligence.

**Same:** PLEADINGS: EVIDENCE. Where the petition in an action for
2    malpractice did not charge as a ground of negligence that defendant failed to take plaintiff to a hospital for treatment, and there was no showing that he did not receive proper treatment at home, evidence that the usual practice would suggest taking plaintiff to a hospital was inadmissible; as defendant could only act in an advisory capacity in the matter and it did not appear that his advice was asked.

**Same:** EVIDENCE: PREJUDICE. In an action for malpractice, evidence
3    of the total sum of defendant's charges for the care and treatment of plaintiff, which was large, and in the absence of any showing as to the items would tend to prejudice the jury, was inadmissible.

*Appeal from Cedar District Court.*—HON. W. N. TREICHLER,
Judge.

THURSDAY, MAY 8, 1913.

ACTION for damages against the defendant for alleged
malpractice as a physician and surgeon. There was a trial
before a jury and a verdict and judgment for the plaintiff
for $800. The defendant appeals.—*Reversed.*

*Chas. W. Kepler & Son,* for appellant.

*Remley & Calkins,* for appellee.

EVANS, J.—In July, 1910, the plaintiff met with a seri-
ous accident. He was thrown under the wheels of his loaded
wagon. His observable injuries were a wound upon `the
back of the head, a "mashed" check bone, and two compound
fractures of his left lower jaw. The defendant was a phy-
sician at West Branch four or five miles distant and was
sent for. When he came, he found the plaintiff lying upon
the ground at the place of the accident. He extended im-
mediate temporary relief and removed the patient to his
home. In the treatment of the plaintiff the most difficult
problem was presented by the compound fractures of the
jaw. The complaint in this case is directed against, and
confined to, the methods adopted by the defendant for the
treatment of such fractures. It is undisputed that the in-
jury was a very serious one and one with which it was very
difficult to deal safely and successfully. By a "compound"
fracture is meant a fracture attended with the penetration
of the outer skin or mucous membrane, so that the injury is
thereby subjected to the dangers of infection from without.
In this case the flesh wounds of the compound fractures were
in the mouth, and more or less dirt had been forced into the
mouth and into contact with the wounds by the circumstances

of the accident. The segment of the jaw between the two fractures had been drawn out of position by the contraction of the muscles and had been drawn upward. One of the problems confronting the surgeon was to restore such segment to its place and to secure it in its proper position. In order to do that, sufficient force had to be applied in some way to overcome the tendency of the contracting muscles. An instrumentality was constructed which was known as an interdental splint. It is known in this record as ''Exhibit B.'' The principal complaint of the plaintiff is directed against the use of this instrumentality. The defendant called to his assistance an experienced dentist. A wax impression was first made of the plaintiff's jaw and teeth. This impression was used as a model for the construction of Exhibit B, which was made from rubber or gutta percha upon the form of the wax impression. It was so placed over the teeth of the patient as to hold the broken segment in place with a view thereby to bring the fractured ends in apposition and to accomplish a union thereof. Provision was made for the cleansing of the patient's mouth several times daily. These provisions were carried out faithfully by plaintiff's wife as his nurse. Exhibit B was kept in the mouth of the patient for a period of five weeks. It was very uncomfortable. It interfered with the closing of the plaintiff's mouth and with expectoration and with swallowing. There was more or less infection present. The plaintiff's breath became offensive. In the course of five weeks he became sick with pleurisy. Another operation was performed by another surgeon for the removal of pus from the pleural cavity. Exhibit B was removed at the expiration of five weeks. A union had not occurred, or at least was not complete. The patient's general condition was very grave and the chances of recovery were against him. No further surgical attention was given to the jaw. In time the union resulted, and at the time of the trial, the place of fracture was not readily discoverable by the expert witnesses. The alignment, however, was more or less imperfect.

There was another surgical method known to the profession which might have been adopted by defendant. This consisted in drilling several holes in the jaw and in each end of the broken segment and drawing and holding the parts together with the use of a silver wire. This method also had its perils. In case of infection there was danger of necrosis of the bone. It increased somewhat the danger of infection because it was impossible to wholly eliminate infecting bacteria from the mouth. It was the contention of the plaintiff appellee that the use of Exhibit B was unwarranted and clearly negligent on the part of the defendant and that the other method referred to should have been adopted.

The foregoing is perhaps a sufficient statement of the general facts to enable a comprehension of the questions presented on this appeal and hereafter discussed.

I. At the close of the evidence the defendant moved for a directed verdict on the ground that the evidence failed to show any negligence or breach of professional duty on his part. The motion having been overruled, the question involved is now presented for our consideration. As to the general duty of the physician to his patient there is no dispute between the parties. Whether the defendant departed from the standards of his profession in his treatment of the plaintiff is a question which from its very nature must be determined in the main upon the expert testimony of other physicians. The plaintiff used two such witnesses. The first was Dr. Whites.

1. PHYSICIANS: malpractice: evidence.

The following is his testimony complete:

I live in Iowa City. Am a physician about sixteen years, and in the active practice all that time. I have had cases of fracture of the jaw. The effort of the surgeon is to replace any malposition that may be and to hold it in such position and so far as possible to keep the wound clean. After the bones have been put in position—natural position—usually a splint and wiring and some bandages is necessary; that is a simple bandage to hold the bones of the jaw; ordinarily a

splint or wiring the jaw together, then bandaging them so they will be mobilized. Sometimes it is advisable to drill holes in the bones and wire them in such a way that they can't be separated—ordinarily silver wire. It would be difficult to say; you may perhaps wire most any part of the jaw on the side—it might be. I couldn't say that it is the usual practice, but may be by some surgeons; other surgeons would depend on the splint. Q. What are the results with wiring, as a rule? A. If the apposition is good and there is no separation, the result ought to be satisfactory. A healthy person of temperate habits and good health, full of life, of forty-five years, the bones ought to knit together in from four to eight weeks. If there is no separation, the bones would be probably firmly united. At the end of eight weeks he ought to be able to chew solids if the union has been satisfactory. Q. When you speak of splints, what kind of splints receive the approval of the medical profession? A. There are almost as many splints as there are operators. The Kingsley splint is the most common probably. That is a splint made by the dentist and is designed to hold the bones by the use of a bandage; that is, the splint is so arranged that there is a projection outside of the mouth. The bandage goes around the wire, and the dentist makes an impression of the jaw, then vulcanizes the wire in the rubber, and it projects, and the bandage is put on and holds it up in that position. Q. In that case do the lower jaw teeth come up firmly against the upper jaw teeth? A. Not necessarily. Q. Is it good practice to place a splint or plate over the teeth in such a way that a person is unable to close his mouth? A. In some cases it might be good practice; in others it might not. A person would have to be guided by the case before him. It is not always possible to lay down a rule that covers every case. If the mouth is kept open, a person would probably have laryngitis or pharyngitis, or both. Pharyngitis is inflammation of the membrane lining the pharyngeal space. Q. In such case might it extend to the pleura? A. Well, not necessarily. Q. Would it be likely or liable to? A. I would say that the probability would be that it would not. An individual whose resistance was reduced would be more likely to contract pleurisy than an individual who was in a normal condition. The causes are so numerous that I could not tell in a few words. It may be from tuberculosis or from

pneumonia. It sometimes comes when it is difficult to say what is the exciting cause. If the pus found its way into the pleural cavity, he would have pleurisy. Q. Suppose the patient had a splint covering his teeth in such a way that it could not be cleansed, and it became very offensive, and there was evidently decomposition of food or any substance that got in there, and it remained that way for five weeks; would not poison from that putrefaction enter his system in any way? A. It might. Q. What is the probability of it? A. If the mucous membranes are intact, the probabilities are that they might not. Q. Would it be possible for the mucous membrane to be intact if this putrefaction was going on to such an extent that the teeth are all loose? A. There would probably be infection of the mucous membrane covering the jaw. Q. Would there be any danger of blood becoming vitiated or poisoned from this? A. If it was absorbed, probably. Q. How would a person prevent it from being absorbed, if it was continued for so long a time? A. Sometimes it is not possible to prevent absorption. Q. Now, in case of a patient who was a healthy man and had a broken jaw and had a splint put over his teeth in such a way as to prevent him from closing his mouth and preventing his teeth from coming together, preventing him by that from masticating anything, and he was being reduced in flesh, in vitality, for five weeks after the splint was put upon him, and he had evidently had a development of pus under his jaw, and before the end of five weeks he felt pain in his side and was treated for pleurisy, what would you attribute the pleurisy to? (Objected to by the defendant because there is no evidence to base hypothetical question upon, it is not a fair presentation of the facts disclosed in the case, and omits evidence as shown in the record as to the character and nature of the injury, etc. The objection overruled, and defendant excepts). A. It is possible that the infection of the jaw might have found its way to the pleural cavity. Q. Would microbes be found in the mouth under such circumstances? A. Yes, they always are there. They multiply very rapidly under such circumstances. They are invisible to the naked eye, and certain varieties are very insistent in entering the human system at every place they can. Q. Now, I will ask you whether it is good practice to leave a splint which covers the teeth in such a manner as to

prevent cleansing the mouth and leave that on the patient without removing it or cleansing the mouth for five weeks? A. I don't think you could lay down a general rule; you would have to be guided by the case in hand. If the mouth became very offensive and disagreeable and the patient was decreasing in strength and vitality, and if he considered the splint responsible for that condition, he would surely remove it. Q. State to the jury whether it is the attending physician's duty to keep the mouth clean from whatever source the condition may arise? A. So far as it is possible to do so. Q. Under what conditions would the physician be justified in leaving Exhibit B in the mouth where the patient was becoming weaker, more emanciated, lower down in vitality, and the mouth becoming more offensive day by day for five weeks? A. If it was simply decomposition of food that was producing the odor and the bone was not yet united, it might be better to leave it in position than to remove it.

The testimony of plaintiff's other medical witness, Dr. Harned, is substantially the same as the foregoing. He was examined more at length, but there is no difference in the substance of the testimony of the two witnesses. We think the testimony as a whole clearly falls short of a showing of negligence or want of skill in the defendant in the use of the appliance Exhibit B. The most that can be said is that the witnesses, if in charge of the case, might have adopted a different course. That would be a difference of judgment only. Indeed, it can hardly be said from this testimony that the plaintiff's medical witness would have adopted a different course. All experts agree that every difficult case presents a zone wherein the question of the best method becomes largely a question of judgment of the attending surgeon under all the apparent circumstances of such particular case. That the appliance was painful or inconvenient, and that infection resulted, and that plaintiff's life was in great peril, were all matters incident to the natural results of the original injury. The best of surgical treatment might not be able to avoid them. The emphasis of plaintiff's case has been laid upon

these circumstances.  Of themselves they are clearly insufficient to prove negligence of the defendant.  Upon the record as made, we think the defendant was entitled to the directed verdict.

II.  In the examination of Dr. Harned as a witness for plaintiff, the following occurred:

Q.  Doctor, state whether the ordinary practice would suggest taking the patient to the hospital?  (Objected to by the defendant as being incompetent, irrelevant, and immaterial.  The objection overruled, and the defendant excepts).  A. I believe it would have been nice to have him in the hospital.  (The defendant moves to strike out the last answer as being incompetent, irrelevant and immaterial. • The motion overruled, and the defendant excepts).  Q.  Where the patient was injured and lived seven miles from a hospital, I will ask you if there would be any difficulty in removing to the hospital?  (Objected to by the defendant as being incompetent, irrelevant, and immaterial.  The objection overruled, and the defendant excepts).  A. I think not.  Q. Would the care which such a patient receives in such hospitals, as you know to be within seven miles at Iowa City, would it have been as efficient as the care that could be given at his home?  (Objected to by the defendant for the same reasons as last above.  The objection overruled, and the defendant excepts).  A. I think so.  Q. What would have been the expense at the hospital as compared with the home treatment?  (Objected to by the defendant as incompetent, irrelevant, and immaterial.  The objection overruled, and the defendant excepts).  A. It would depend upon the provisions made for his care at home.

2. SAME: pleadings: evidence.

This examination was clearly improper and the objection should have been sustained.  The petition charged no negligence against the defendant for failure to take the patient to the hospital.  There was no claim in the evidence that he had received improper nursing at home.  The question of whether the patient should go to the hospital at Iowa City was not within the control of the defendant. He could only advise in any event.  There is no claim that his

advice thereon was asked or that the question was discussed in any way.

III. Some testimony was introduced by plaintiff relating to the defendant's charges for his services. The amount all told was over $1,500, and the defendant obtained from the plaintiff a promissory note for the greater part thereof. It was also shown that the defendant sold the note. Complaint is made of this testimony as being irrelevant and immaterial and calculated to prejudice the jury. We fail to discover in the record any legal reason for the introduction of this testimony. In the absence of a showing of items entering into the sum total, it would impress the jury, as it impresses us, as an extraordinarily large bill and could not fail to create a hostile feeling against the defendant. The amount of the verdict rendered is rather suggestive that the real intent of the jury was to reduce the defendant's bill to a reasonable extent, rather than to compensate plaintiff for damages suffered, as a result of negligence. If the defendant charged the plaintiff an exorbitant bill and improperly obtained his note therefor, a direct issue of that kind should be made and a recovery sought upon such ground. An opportunity would thus be afforded to the defendant to justify his charges if he could. If there is an obstacle in the way of such suit by reason of a valid settlement, the same obstacle should bar the interjection of such question into this case. If the obstacle is surmountable, let the issue be directly made.

3. SAME: evidence: prejudice.

We need not deal with other questions argued, as they are such as are not likely to arise upon a retrial.

The judgment of the court must be *Reversed.*