## Jett v. Linville.

(Decided February 22, 1924.)

### Appeal from Kenton Circuit Court.

1. Physicians and Surgeons—Anaesthetist Not Responsible for Acts of Surgeon.—Since an anaesthetist is directly chargeable with the physical condition of the patient in the operating room and his attention must always be directed solely to administering the proper amount of anaesthetic, he is not responsible for any carelessness of the physician performing the operation of which he has no knowledge.

2. Appeal and Error—Prejudicial Error to Permit Witness to Testify in Defiance of Statute.—In action by wife for malpractice, it was reversible error to permit plaintiff's husband, contrary to Civil Code of Practice, section 606, to testify in detail relative to the case.

3. Physicians and Surgeons—Evidence Held Not to Show Negligence.—In action for damages for injuries resulting from operation, evidence held insufficient to show negligence on the part of the attending physician, or that any injury resulted from the alleged negligence.

NORTHCUTT & NORTHCUTT and O. M. ROGERS for appellant.

A. E. STRICKLETT for appellee.

OPINION OF THE COURT BY JUDGE ROBINSON—Reversing.

During the first part of December, 1919, the appellant, Dr. N. A. Jett, of Covington, Kentucky, was called to the home of appellee, Jeannie Linville, who claimed to be suffering from excessive menstruation that dated back to the month of October. She alleged that the flow occurred every two or three days, and as a result she was frequently confined to her bed. Dr. Jett was in constant attendance upon her, visiting her home and prescribing such remedies as are usually employed in cases of this nature. However, her condition did not respond to the

treatment, and on January 18, 1920, he called in Dr. Joseph Northcutt, who, after making a digital examination, endorsed the treatment that she had been receiving, and further advised rest and the elevation of the foot of her bed; and stated that, if this failed to afford relief, he deemed an operation necessary.

On January 23, five days later, as appellee's condition remained unchanged, Dr. Edward Northcutt, a surgeon, was called. He made an examination of Mrs. Linville, known as the bi-manual test, consisting of inserting two fingers into the vagina, the other hand being placed on the abdomen; and it was discovered that blood was flowing from the uterus and escaping through the vagina. Owing to this condition that had existed almost continuously since the latter part of October, 1919, Mrs. Linville was pale, anemic and weak, owing to the loss of blood, and was confined the greater part of the time to her bed. Instead of improving, she gradually grew worse; though at all times both the doctors Northcutt entirely approved of the treatment given by Dr. Jett, which, though of the latest known and designed to correct conditions of this kind, nevertheless, failed to afford the desired relief, and Dr. Edward Northcutt advised an immediate operation. In addition to the discharge above described, the surgeons discovered upon examination that the mouth of the womb was standing open, while the womb itself was retroverted; that is, the upper portion or uterus was turned toward the backbone and had fallen into the hollow of the sacrum, and was immovable owing to adhesions and newly formed tissue. In this retroverted position the surgeons stated that any attempt to restore the uterus to its normal place through bi-manual manipulations would result in a hemorrhage, and the only safe course by which a cure could be expected was a laparotomy, an operation by means of which the abdomen is opened, the adhesions destroyed and the uterus restored to its normal position.

During the time appellee was being treated and before the operation, the physicians suspected that she might be in a pregnant condition, and advised that, should this be a fact, curettement or packing of the uterus, both of which are sometimes resorted to in an endeavor to prevent flooding or excessive bleeding, would cause an abortion, and for that reason it was not deemed wise or safe to resort to either of these methods. It appears further that on January 27 appellee was taken to the

Booth Memorial Hospital, where on January 28 an operation was performed by the surgeons Northcutt, and they discovered the retroverted uterus bound down, just as they had predicted; and it was further found that she was in a state of pregnancy of about three months duration. It is further testified that the adhesions by reason of which the uterus had remained in its unnatural condition were destroyed, and the womb lifted from its abnormal position and proper treatment applied to support and cause it to remain in its place. During the operation the evidence discloses that the surgeons, as a precautionary measure and to prevent the secretions from escaping into the abdominal cavity and thereby causing infection, placed gauze in the vagina in order to absorb the secretions and to support the cervix of the uterus during the work. But before inserting the gauze a stitch was taken in the mouth of the cervix for the purpose of closing it and preventing the escape of any secretions from the uterus, or the entrance of infectious matter into it, being also an additional precautionary measure employed to prevent the development of infection from the operation. It is further claimed that after the stitch was taken in the cervix of the uterus the gauze was placed in the vagina in front of the stitch and between it and the surgeon; and that after the operation was concluded, the gauze was removed and the stitch taken out of the cervix of the uterus and that this stitch, so placed, could not have been reached without the removal of the gauze. The evidence shows that after the operation, which was apparently a complete success, the appellee was placed in the care of nurses in the hospital and remained there for about ten days, during which time she improved so rapidly that she was taken to her home on February 7, and within a few days resumed her household duties. While in the hospital she was seen several times by the surgeons, as well as often by Dr. Jett, who took her home and visited there almost daily, frequently examining the wound caused by the operation and finding it in a thoroughly satisfactory condition.

In her testimony appellee says that on February 13 she complained to Dr. Jett of a feeling of discomfort in the vaginal cavity and the belief that some substance of a foreign nature was therein, whereupon the doctor examined her and found protruding from the mouth of the vagina a piece of cotton or gauze about two inches long and probably about half an inch in thickness. She al-

leges that for some days she had been conscious of a very disagreeable odor which had been noticed by a visitor, and when the cotton was removed it was much discolored and the odor penetrating and nauseous. However, in his testimony appellant denies the existence of any odor or discoloration, and states that the cotton was easily removed, and after examining it he threw it in the fire.

In her petition appellee claims that her person was greatly irritated by reason of this cotton or gauze having been left in the vagina and that she suffered excruciating pain, as well as great mental anguish on account thereof; that she was caused to be and remained sick and nervous; that her health was permanently impaired; and she prayed for damages in the sum of $5,-000.00.

After a careful review of all the testimony offered in this case we can find nothing of a substantial nature calculated to sustain these contentions; and the fact that just six months after the operation she gave birth to a healthy, strong, normal baby, would not tend to induce or strengthen the belief that she was inconvenienced to any extent, or that she had just cause for complaint; and in any event the testimony shows conclusively that appellant, Dr. Jett, could have taken no part whatever in the operation performed other than administering the anaesthetic. It is a well established rule in surgical operations that the anaesthetist is directly chargeable with the physical condition of the patient in the operating room, and his attention must always be directed solely to administering the proper amount of the anaesthetic and continuing its supply in just such proportions as will insure the patient's remaining in a comitose condition while the knife is being used.

In his testimony, as well as that of the surgeons and attendant nurses, it is definitely and positively shown that the appellant took no part in this operation and did not even see it; and he disclaims any knowledge whatever of the gauze later found in the vagina of appellee.

In the trial of this case a number of well known and prominent physicans, whose testimony is found in the transcript, completely absolve not only the appellant, Dr. Jett, but the defendants, the doctors Northcutt, of any censure or blame whatever; and are unanimous in their declarations that, even if the gauze had remained in the vagina of appellee during the period she claims, no ill

effects would have been resultant. They also heartily endorse the accuracy of the diagnosis made by the physicians and the propriety of the treatment given appellee; and in fact her testimony was so indefinite and vague that it would be difficult to conceive upon what theory the jury could have been induced to render judgment in her favor, and it is, indeed, the more strange that in their deliberations they should have dismissed the defendants Northcutt and have found against Dr. Jett in the sum of $1,000.00, as it was forcibly demonstrated that if any of the attending physicians were responsible for the alleged carelessness and neglect, it must have been the surgeons who performed the operation and not Dr. Jett, who only administered the anaesthetic.

At the conclusion of appellee's testimony, her husband, Walter Linville, was introduced, and over the strenuous objections of attorneys for appellant was allowed to testify in detail relative to the case, in open defiance of all precedent and directly contrary to section 606 of the Civil Code. Upon what possible theory or state of circumstances the trial court permitted the husband to testify in this action we are at a loss to understand; but the conclusion is inevitable that it erred seriously in so doing, and if for no other reason a reversal would be imperative.

In their motion for a new trial counsel for appellant offer a number of grounds upon which they rely for a reversal, with all of which, however, we do not feel it necessary to deal, especially in the absence of any brief for appellee, being of the opinion that, stripped of the husband's testimony, the case should never have been permitted to go to the jury, and that appellant's motion for a peremptory instruction at the conclusion of appellee's testimony should have been sustained. Indeed, it would be exceedingly dangerous to permit a case of this character to go to the jury on such flimsy evidence as was woven by appellee; and if it were done it would in force and effect tend to attach a penalty to the practice of medicine or surgery and to greatly injure the reputable followers of that profession and possibly drive them from the field of work that is productive of such incalculable benefit to mankind, and to further prove a strong incentive to unscrupulous and complaining patients to institute litigation without merit.

In this case appellee failed to prove in her own testimony that the injury complained of by her did not re-

sult in a manner different from that alleged and in one that would make appellant liable, and failed to show that the injuries professed to have been suffered by her resulted from negligence on the part of any of the defendants. In the case of Stone v. Van Noy Railroad News Co., et al., 153 Ky. 240, 154 S. W. 1092, it seems that Stone had been employed by defendant to sell soft drinks, among other things, to passengers on railroad trains, and while engaged in this work he alleged that a supercharged pop bottle exploded and a flying piece of glass cut out his eye. There was proof tending to show that Stone's employer knew of the dangerous condition of the pop bottles, though he gave him no warning thereof, and the latter showed that the accident could have happened, as he alleged it did, that is, through the carelessness and negligence of the employer. However, this court held that this was not enough and as the accident might have happened as a result of several other causes, the duty was on Stone to show that it did not in fact result from such other causes; and, in absence of proof to that effect, he failed to make out his case and the peremptory instruction given for the defendant was affirmed.

In the case of Cochran's Admr. v. Krauss, 144 Ky. 202, it is said:

"When the question is one of negligence or no negligence, it is well settled law, that, where the evidence is equally consistent with either view—the existence or non-existence of negligence—the court should not submit the case to the jury, for the party affirming the negligence has failed to prove it."

In the instant case it can clearly be seen that the appellee not only failed to produce evidence of negligence on the part of the attending physician, but also that any injury was the result of such alleged negligence.

If there should be another trial of this case, and the evidence relied on for a reversal does not differ materially from that of the former trial, the jury should be peremptorily instructed to find for the defendants.

For the reasons given the judgment is reversed and the cause remanded for proceedings consistent with this opinion.