RUBY I. NELSON, Appellant, v. CARL L. SANDELL et al., Appellees.

**PHYSICIANS AND SURGEONS:** Malpractice—Evidence. A physician
1   does not impliedly guarantee that his treatment of a patient will be
beneficial. He fully performs his duty when he, with due care,
applies to his patient that treatment which is generally and ordinarily
applied by physicians under like circumstances in the locality in
question. Evidence held insufficient to show that the defendant had
not performed his duty.

**PHYSICIANS AND SURGEONS:**        Malpractice—Non-joint Liability.
2   The mere fact that a physician directs his patient to go to a named
dentist for the extraction of a tooth, and agrees to and does admin-
ister the anæsthetic, does not create such relation as will render the
physician liable for the negligence of the dentist.

**Headnote 1:** 30 Cyc. pp. 1570, 1572, 1573, 1587. **Headnote 2:** 30 Cyc.
p. 1581 (Anno.)

*Appeal from Harrison District Court.*—J. S. DEWELL, Judge.

## JUNE 21, 1926.

Action against a physician and a dentist jointly for mal-
practice. At the close of the testimony, a verdict was directed in
favor of one of the defendants, and the action against the other
was dismissed because not prosecuted in the county of his resi-
dence. From the judgment following, the plaintiff appeals.—
*Affirmed.*

*Robertson & Havens,* for appellant.

*Tinley, Mitchell, Ross & Mitchell, William P. Welch,* **and**
*Fred E. Egan,* for appellees.

VERMILION, J.—The plaintiff and appellant had been, for
some time prior to the transactions in question, under the care
and treatment of the appellee Walsh, a physician, for pains in
her neck, side of the face, shoulder, and arm.
He took an X-ray picture, which disclosed that
appellant had an imbedded and impacted wis-
dom tooth, and told her that it should be extracted. The appel-

1. PHYSICIANS AND
SURGEONS: mal-
practice: evi-
dence.

lant and her mother visited the appellee Sandell, a dentist, and arranged for him to extract the tooth. It was also arranged that Dr. Walsh should give the anæsthetic. On the morning of March 13, 1924, Dr. Walsh administered an anæsthetic to appellant, and Dr. Sandell proceeded with the extraction of the imbedded tooth, first extracting an adjoining tooth that he testified it was necessary to remove. In the attempt to remove the wisdom tooth, the appellant's lower jawbone was fractured. Following this, Dr. Walsh treated the fracture until March 27, 1924, when appellant consulted another physician.

The action is against the appellees jointly. It is alleged that, while acting together and jointly, the appellees, not regarding their duties in the premises, negligently and unskillfully (1) administered the anæsthetic, (2) extracted another tooth immediately in front of the wisdom tooth, (3) extracted the wisdom tooth so as to break appellant's jawbone, (4) failed to properly set such fracture, and (5) failed to properly treat and dress the wounds and injuries of appellant so as to avoid infection, but permitted such wounds to become infected. Damages for pain and suffering and permanent disfigurement and the expense of subsequent care and treatment are claimed.

Upon the trial, at the close of all the evidence, the court directed a verdict in favor of the appellee Walsh, and thereafter dismissed the action as against the appellee Sandell, upon a showing that his residence was in Polk County.

While nearly forty errors are assigned, they may be conveniently grouped, for our consideration, into two propositions: (1) That the court erred in directing a verdict in favor of the appellee Walsh; (2) that the court erred in dismissing the action against the appellee Sandell. If the first proposition shall be determined against the contention of the appellant, it is not seriously insisted that the action as against the appellee Sandell was not properly dismissed. Section 11051, Code of 1924.

As to the alleged liability of the appellee Walsh, appellant claims that there was sufficient evidence to take the case to the jury, (1) upon the question of Walsh's negligence in administering the anæsthetic and in his subsequent treatment of appellant, and (2) upon the question of his responsibility for alleged negligence of the appellee Sandell in the extraction of appellant's teeth and the breaking of her jaw. While the ultimate

questions presented are ones of fact, the facts are to be considered in the light of well established principles of law.

I.   The physician is bound to bring to the service of his patient and apply to the case that degree of knowledge, skill, care, and attention ordinarily possessed and exercised by practitioners of the medical profession under like circumstances and in like localities. *Smothers v. Hanks*, 34 Iowa 286; *Whitsell v. Hill*, 101 Iowa 629; *Ferrell v. Ellis*, 129 Iowa 614; *Haradon v. Sloan*, 157 Iowa 608; *O'Grady v. Cadwallader*, 183 Iowa 178; *Flanagan v. Smith*, 197 Iowa 273; *Furgason v. Bellaire*, 197 Iowa 277. He does not impliedly guarantee results. *Smothers v. Hanks*, supra; *Kline v. Nicholson*, 151 Iowa 710. Whether the defendant exercised the degree of care and skill required of him cannot be determined from the testimony of laymen or non-experts, since it is only those learned in the profession who can say what should have been done, or that what was done ought not to have been done. *Smothers v. Hanks*, supra; *Kline v. Nicholson*, supra; *Cozine v. Moore*, 159 Iowa 472; *Snearly v. McCarthy*, 180 Iowa 81; *Flanagan v. Smith*, supra.

In view of the directed verdict for the appellee Walsh, we are required to view the evidence in the light most favorable to appellant. It is undisputed that the anæsthetic was administered to appellant at the dentist's office about 9 o'clock on the morning of Thursday, March 13th. Appellant did not come from under its influence until afternoon, and it was 4 o'clock before she was able to sit up. It is also undisputed that, immediately upon discovering that the jawbone was fractured, and while appellant was still unconscious, Dr. Sandell, in the presence of Dr. Walsh, cleansed the wound by wiping out the mouth and using iodine and an antiseptic spray. Dr. Walsh testified without contradiction that he then lined up the bones as best he could, and held them while Dr. Sandell applied a bandage. At 6 o'clock that evening, Dr. Walsh visited appellant, and put on a leather strap, to hold the jaw in place. He saw her either at her home or at his office each day thereafter until she dispensed with his services. The X-ray picture taken before her teeth were extracted indicated the presence of pus at the root of one of the teeth, and Dr. Sandell testified that after the extraction there was pus draining from the wound. This testimony was uncontradicted. The appellant testified that, on the Sunday following the ex-

traction, there was a whitish discharge from her mouth, and that Dr. Walsh, on the preceding Friday, had given her a spray, to be used by the attending nurse, by which her mouth was washed out. On Monday and Wednesday, he changed the dressing, and on Thursday, he took another X-ray picture of the jaw. On Friday, he removed the chin strap and worked the jaw, to get it in place, and Dr. Sandell, under his direction, wired the upper and lower teeth together. Another X-ray picture was then taken. On Sunday, the discharge continuing, Dr. Walsh gave appellant a violet-ray treatment, and this was repeated on subsequent days. On Tuesday, Dr. Walsh used an electric spray on the wound, and washed out small pieces of bone. On Wednesday, he said that the picture showed that the jaw was not set right. The wires were taken off, and he manipulated the jaw, to get the bones in place, and Dr. Sandell again wired the teeth together, under his direction. The nurse testified that the irrigation was kept up carefully; that she kept up the drainage from the cavity, so that it would come out of the mouth, as nearly as possible; that Dr. Walsh gave the directions, and she followed them.

Appellant presented three experts, who testified at some length as to the proper methods to be pursued in reducing a fracture of the jaw and treating one in the situation of appellant. Dr. Cole testified that the usual method of treating such a fracture would be to get perfect alignment, both of the jaw and the teeth, and a fixture to hold them in place; that possibly one of the best methods would be an X-ray examination, and manipulation to get the alignment; that, if there was an open wound, some means to prevent infection should be commenced at that time—an antiseptic wash, to keep the parts clean; that the ordinary way of obtaining cleanliness of the wound would be mostly by washes, local applications, iodine, or other antiseptics, applied to the wound. He testified that a common and usual bandage employed is a piece of sole leather, formed to fit the chin, and strapped tight over the head, and that, if that did not hold, the wiring of the teeth would be proper; that for that a dentist would be called; that the doctor would first secure apposition of the bones and alignment of the jaw and hold these in place, before the dentist would tighten the wires; that, if there was not proper alignment, there should be another attempt. He

also testified that it would be more than a week before there would be union of healthy bone, and in an infected bone there would be no union until the infection was cleared up. He further testified that an ordinary method of reducing inflammation and swelling would be hot or cold applications.

· Dr. Anderson testified to substantially the same effect. He said that, if the bandage was not holding the fracture, the general practice would be to readjust the bandage. He also testified that the usual method of using a disinfectant would be by irrigation, by a spray; that, "with a broken jaw, you would want to interfere as little as possible with any movement of the jaw in treatment," and that the usual method is to apply the wash by spray or irrigation; that "heat is not a disinfectant, unless you get sufficient heat to kill the particular germ. You could not apply sufficient heat outside of the cheek covered by bandage for this purpose."

Dr. Dewell, a dentist and oral surgeon, testified that, in the usual and ordinary method of treatment:

"The first would be the reduction of the fracture,—that is, to get the fragments in as good alignment as possible. Second would be the fixation of the fragments in position until union occurred. Third would be the care of the tissues."

He testified that the method of holding the fracture would depend on the particular conditions of the patient; that, generally speaking, the practitioner would attempt to hold it by bandages; that very frequently the first attempt is not successful; that it is frequently found that, with two or more methods, that fixedness is not secured that is necessary; that wiring the teeth is a well recognized method. There was no testimony from which it could be found that the antiseptic wash used by Dr. Walsh was not a proper one.

We have not attempted to set out all of the testimony, but sufficient of that of the expert witnesses offered by appellant, in the effort to show that the treatment given the patient by Dr. Walsh was improper, to demonstrate, as we think, that there was no evidence that would warrant a finding that the methods used by Dr. Walsh in treating appellant varied materially from those approved and used by physicians and surgeons generally.

It is claimed that Dr. Walsh did not begin the use of the antiseptic wash or spray immediately after the fracture. He

testified that he gave a prescription for the antiseptic and the device for using it on the evening of the day appellant's teeth were extracted. This is not directly contradicted, although appellant and the nurse testified that use of the spray was begun on the following day. But it is undisputed that appellant's mouth and wound were cleansed and sprayed with an antiseptic solution immediately after the jaw was fractured, and that this was done in Dr. Walsh's presence.

It is also said that there was testimony that the general and approved method of treatment required the use of hot or cold applications, and that neither was used. The testimony on behalf of appellant was to the effect that hot applications such as would have been effective to prevent or overcome infection could not have been applied, and that cold applications would only have tended to relieve pain, and would have had no curative effect.

As we have seen, it is not the mere failure to effect a cure that determines the practitioner's liability; and whether he used the skill and care required is, of necessity, to be determined from the expert testimony of those who are competent to say what skill and care ought, according to the ordinary standards of the profession, to be used in a given case. We are clearly of the opinion that the plaintiff produced no evidence tending to show that the methods used by Dr. Walsh and the care and attention given by him to appellant in any material respects fell short of those ordinarily used by practitioners in like localities in treating like injuries.

II. The appellant testified that, after taking an X-ray picture of her jaw, Dr. Walsh told her that the imbedded wisdom tooth was causing her trouble, and that it would be best to have

2. PHYSICIANS AND SURGEONS: malpractice: nonjoint liability.

it extracted; that they talked of dentists, and he told her she would have to have another X-ray taken, if she went to Dr. Dewell, another dentist; that the latter would not accept his picture, but Dr. Sandell would; that "he told me or directed me to go to Dr. Sandell, to have it pulled;" that she went to Dr. Sandell, showed him the picture, and told him that Dr. Walsh advised having the tooth extracted; that Dr. Sandell said he could do it the following morning, and directed her to go to Dr. Walsh and ask him to administer the ether; that she returned to Dr. Walsh and

asked him to administer the anæsthetic and "take care and look out for my interest in the operation that morning, and he said he would." She further testified that, before the operation, when the doctors were together:

"I told Dr. Walsh I would pay him, but I wanted him to see me through the operation, and help Dr. Sandell, and I would pay him, when I got through; and I told Dr. Sandell about the same thing. They said it would be all right. * * * They were to take the case — see me through, and watch out for my interests through the operation, and when I went under the influence of the ether."

Appellant's mother testified that Dr. Walsh said "he would go and administer the anæsthetic and take care of her until she did not need a doctor."

We think this testimony has no tendency to show a joint employment of the appellees to extract the tooth, or to establish any relation between them by virtue of which Dr. Walsh would be liable for alleged negligence of Dr. Sandell. Dr. Walsh did not undertake to extract appellant's tooth, or to have it extracted by Dr. Sandell. There was no relation of partnership or agency between them. The most that the testimony tends to show is that Dr. Walsh directed appellant to go to Dr. Sandell for the purpose of having the tooth extracted, and that plaintiff employed Dr. Sandell for that purpose, and employed Dr. Walsh to administer the anæsthetic. Her statement that Dr. Walsh consented to look after her interests in the operation is not susceptible of the construction that he thereby agreed to be responsible for Dr. Sandell's negligence. At most, he was to "help" Dr. Sandell.

The mere recommendation by one doctor of another does not make the one liable for the malpractice of the other. *Hitchcock v. Burgett*, 38 Mich. 501; *Harris v. Fall*, 100 C. C. A. 497 (177 Fed. 79, 27 L. R. A. [N. S.] 1174). This has been held to be true where one physician advises an operation and, with the consent of the patient, arranges for it to be performed by another, a competent surgeon, whom he assists. *Brown v. Bennett*, 157 Mich. 654 (122 N. W. 305). And where the physician in charge of a patient calls a surgeon into the case to operate, and assists in the operation by doing what he is directed by the surgeon to do, it has been held that he is not liable for negligence in the operation, in the absence of negligence in recommending the surgeon or on

his own part in assisting him.  *Mayer v. Hipke,* 183 Wis. 382 (197 N. W. 333).

While the skill and knowledge required of a physician and of a dentist are the same in degree, they are obviously different in character.  They must each possess and exercise the knowledge, skill, and care ordinarily possessed and exercised by practitioners of their particular art in like localities; but the physician is not required to have or exercise the peculiar skill or knowledge required of the dentist, nor is the latter bound to possess the knowledge essential to the general practice of medicine or surgery.

There is no testimony tending to show that Dr. Walsh took any part in the actual extraction of appellant's teeth, except that he administered the anæsthetic and assisted Dr. Sandell by handing him instruments and disposing of blood clots by throwing them on the floor.  There is testimony from one witness that at one time he suggested a change of forceps, but no showing that the suggestion was acted upon.

Aside from the foregoing, the testimony of Dr. Walsh is uncontradicted that, in administering the anæsthetic, he was at appellant's head, and she was in front of him, lying in the chair; that he watched her heart action and respiration, and, when she was in a profound sleep, told Dr. Sandell the patient was ready, and after he started to operate, watched the condition of the patient; and that he could not see into the mouth of the patient during the operation.

It is well settled that, generally speaking, a physician who merely administers an anæsthetic to a patient who is operated on by another is not liable for the negligence of the operating surgeon.  *Robinson v. Crotwell,* 175 Ala. 194 (57 So. 23) ; *Jett v. Linville,* 202 Ky. 198 (259 S. W. 43) ; *Morey v. Thybo,* 118 C. C. A. 198 (199 Fed. 760).  In *Morey v. Thybo,* supra, the court said:

"Each, in serving with the other, is rightly held answerable for his own conduct, and as well for all the wrongful acts or omissions of the other which he observes and lets go on without objection, or which, in the exercise of reasonable diligence under the circumstances, he should have observed.  Beyond this his liability does not extend."

See, also, *Withington v. Jennings* (Mass.), 149 N. E. 201 ; *Wilkins v. Ferrell,* 10 Tex. Civ. App. 231 (30 S. W. 450).  There is nothing in the record from which it could be found that Dr.

Walsh observed or could reasonably have observed any negligence, if any such there was, on the part of Dr. Sandell.

With no evidence tending to establish either negligence on the part of the appellee Walsh or his responsibility for negligence of the appellee Sandell, if he was negligent, the court rightly directed a verdict in favor of the former. .

Since, if a verdict in favor of Dr. Walsh was properly directed, the action was rightly dismissed as to Dr. Sandell, we are not called upon to, and do not, express any opinion as to whether there was evidence tending to establish negligence on the part of the latter in the extraction of appellant's teeth or in the breaking of her jaw; nor is it necessary to consider whether the doctrine of *res ipsa loquitur*, much discussed in argument, is applicable to that injury.

The judgment below is—*Affirmed.*

De Graff, C. J., and Stevens and Faville, JJ., concur.