Opal Kirchner, Appellee, v. Dorsey & Dorsey, Appellants.

No. 44430.

FEBRUARY 14, 1939.

REHEARING DENIED JUNE 23, 1939.

Hollingsworth & Hollingsworth and Rendlen, White & Rendlen, for appellee.

J. O. Boyd and Dutcher, Ries & Dutcher, for appellants.

MITCHELL, J.—Opal Kirchner, wife of a Baptist minister, living in northern Missouri, in 1934 was twenty-one years of age, and the mother of one child. She was suffering from a retroverted uterus, an eroded and encysted cervix, appendicitis, and dysmenorrhea. She consulted Dr. Grace Gray, an osteopathic physician of Kahoka, Missouri, and together they consulted Dr. George Laughlin, an osteopathic surgeon at Kirksville, Missouri. On the 16th day of February Mrs. Kirchner, her husband, and Dr. Gray, traveled to Keokuk, Iowa, and there consulted Drs. Dorsey and Dorsey, who are practicing physicians and surgeons in that city, men of training and experience in

their profession. Drs. Dorsey and Dorsey diagnosed Mrs. Kirchner's ailments as above set out, and recommended that she have an operation. She was taken to the Graham Hospital in Keokuk, and on the next day the operation was performed by them.

The operation consisted of conization of the cervix, which was performed by means of a radio frequency knife in which the cutting is done by an electric current, of varying intensity, depending upon a rheostat that may be controlled by the operator by a switch. Following this the abdomen was opened, and suspension of the uterus and an appendectomy were performed. Dr. F. B. Dorsey, Jr., did the actual operation, assisted by his father, Dr. F. B. Dorsey, Sr.

The uterus is a pear-shaped organ in the female anatomy, and the lower portion thereof is the cervix and contains the cervical canal. The cervix extends into the vagina and is the passageway thru which menstruation takes place. Conization of the cervix consists of removing a conical shaped portion at the lower end of the cervix, which is known as the lower or external os.

After the removal of the cone, the cervix was packed with iodoform gauze and the abdomen opened for the suspension of the uterus and the appendectomy. The operation was performed under a general anesthetic.

From the record it is evident that in a coning operation of the kind performed upon Mrs. Kirchner, a raw surface is left around the walls of the cervical canal and if nothing is done to prevent them coming in contact they will grow together and occlude or close this canal. The evidence shows that in this case all that was done to keep open this canal was to place gauze in same. However, the gauze was removed a day or two later and nothing thereafter was done to prevent occlusion.

From the date of the operation on February 17th until the time that plaintiff left the hospital, nineteen days later, the jury could have found from the evidence that, with the exception of the removal of the gauze, there was no examination of the cervix, no treatment of the wound, and nothing was done to hold apart the raw surfaces. There was no examination of the condition of the cervix, by either of the defendants, at the time that plaintiff was told she could leave the hospital.

In April, May and June she had intense periods of suffering, and on the 24th day of June she applied to Drs. Dorsey and

Dorsey for relief, again being accompanied by her local doctor. At that time the cervical canal was opened with dilators. A dilator is an instrument used by medical men in forcing an opening into the cervical canal. No anesthetic was given. Plaintiff was in the hospital twenty-four hours at that time. Again in July and August she suffered cramps, with great intensity and severity in length of time. She returned, on August 11th, to the offices of Drs. Dorsey and Dorsey and appealed for help. At that time the cervix was grown over with the same sort of scar tissue as before. Again the cervical canal was opened with a dilator, without the use of an anesthetic. No other treatment was given and no precaution taken to prevent occlusion. Upon returning home from this treatment her local doctor, Dr. Gray, for the purpose of keeping open the cervical canal, placed in the canal a pessary. However, by November 6th this had come out and plaintiff again suffered great pain during September, October and November. On the 25th day of November she returned to Drs. Dorsey and Dorsey for treatment. Again it was suggested that she go to the hospital for the purpose of opening up the cervix more. Plaintiff said she could not stand the pain, and returned home. Early in December of 1934 she went to Dr. George Laughlin, a surgeon living at Kirksville, Missouri, who attempted to establish an opening in the cervical canal but was unsuccessful. He then opened the abdomen and removed the uterus.

Mrs. Kirchner in 1936 commenced this action to recover damages against the defendants in the amount of $30,000. There was a trial to a jury, in which a great volume of evidence was submitted. The jury returned a verdict in the amount of $7,500. The defendants being dissatisfied, have appealed.

I. It is claimed that the court erred in holding that appellee's petition was sufficient to allege a cause of action.

The petition was attacked by a motion for more specific statement. The record shows that upon a submission of this motion certain parts of it were sustained and certain parts were overruled; that, to meet the requirements of the ruling on the motion, the appellee filed an amendment to her petition, and thereafter the appellants filed answer.

In Crow v. Casady, 191 Iowa 1357, at page 1359, 182 N. W. 884, at page 885, this court said:

"After these several motions had been filed and ruled on, the appellant filed an answer, and went to trial. This constituted a waiver of any error that might have been committed in the rulings on the several motions, and we cannot now consider the alleged errors in such rulings."

So in the case at bar, the filing of an answer waived the defect in the motion for a more specific statement.

This same question was again raised on the motion in arrest of judgment, which was overruled by the court. The only question which is raised by a motion in arrest is whether the petition wholly fails to state a cause of action, not whether the petition should have been made more specific.

Apropos to the principle relied upon by the appellants, Justice Morling, speaking for this court, in the case of Pomerantz v. Pennsylvanie-Dixie Cement Corp., 212 Iowa 1007, at page 1010, 237 N. W. 443, at page 444, said:

"Whether or not a motion for more specific statement would lie is a question not before us. * * * The facts out of which plaintiff's injury arose were set out. The petition contained a general averment of negligence. It was good as against general demurrer or motion in arrest."

With this rule of law in mind, let us look at the petition in this case:

It avers that the appellants are duly licensed surgeons and they advised appellee that a surgical operation upon her was necessary, and appellee submitted thereto; appellants undertook to operate upon her and treat her. It thus avers the duty arising on the part of the appellants. It then avers that the appellants were negligent, careless, and performed the operation in an unskillful manner; that they "negligently, carelessly and unskillfully injured the appellee's uterus, its tissues and lining and parts thereof so that the openings, passages and canals thereof adhered and grew together and their functions were injured and destroyed." Further, that because of appellants' said negligence appellee was made sick and suffered great pain, and it was necessary to have the appellee's uterus entirely removed, by means of which she was rendered sterile; that all of this was the proximate and direct result of the carelessness, negligence, and grossly unskillful manner in which appellants performed said

operation and cared or failed to care for appellee therein and thereafter.

As in the cited case, the facts out of which appellee's injuries arose, were set up. There was a general averment of negligence, and it was good as against a motion in arrest.

II. It is the claim of appellants that the court erred in overruling appellants' motion for directed verdict, made at the close of the evidence, particularly upon the ground that "the evidence wholly failed to show the defendants' negligence, if any, was the proximate cause of plaintiff's injury and damage."

It is elementary that in actions for negligence the plaintiff has the burden, not only of proving negligence, but of proving that the negligence of the defendants was the proximate cause of the plaintiff's injury and damage. And in considering a motion to direct a verdict the evidence must be considered in its most favorable light to the party adverse to the motion.

There is no question in this record that there is a dispute as to whether the appellants used the approved method in the operation performed. It is true, the appellants attack the evidence of a medical man because of the fact that he lived in Fort Madison, Iowa, a short distance from Keokuk, and this will be taken up later in the opinion.

The operation was performed by appellants. Some months later it was necessary to force an opening into the cervical canal. Again this was done by appellants. A few months later it was necessary to perform the same operation, and finally, when appellee went back on the fourth occasion and it was suggested that she undergo another operation of the same kind, she said she could not stand the pain. Up to this point the entire medical attention appellee had received was in the hands of appellants, who had complete and absolute charge. There is no question that the appellee did not receive the relief she sought and which appellants were trying to give to her. Upon returning after the last visit to appellants, her local doctor, Dr. Gray, inserted what is known as a pessary, which is described as a round, button-like instrument, which, at the upper end, has two prongs that spread, and between the prongs and the button part there is a coil spring. It is the claim of appellants that it was the insertion of the pessary that caused the damage,

rather than the method in which the operation was performed or the treatment thereafter given.

However, long before the pessary was inserted, the evidence shows that appellee was confronted with difficulties. Medical men say that after an operation of this kind something must be done to prevent the canal closing or growing together, and that various devices are used, such as inserting a tube. All that was done in this case was to insert gauze, which was removed within a day or so, and thereafter nothing more was done. That the canal did grow together and close is shown by the fact that appellants on two different occasions used dilators in order to open it. And this was long before the insertion of the pessary.

Clearly, under this record, there was sufficient evidence that the negligence of the appellants was the proximate cause of appellee's injury.

III. Next, appellants complain that the court erred in submitting to the jury as a basis for finding appellants liable, the subsequent treatment following appellee's discharge from the hospital in 1934.

The complaint is based upon the theory that the petition did not charge negligence or seek damages for anything that happened thereafter. A brief quotation from the petition will show that this is not the case.

It is alleged that the appellants negligently, carelessly and unskillfully injured the appellee's uterus, its tissues, linings and the parts thereof so that the openings, passages and canals and inner portion thereof adhered and grew together and the functions and uses of the parts and similar organs of appellee were injured and destroyed. The damages, including pain and suffering, permanent injury, and the removal of the uterus, are set out, followed by this allegation: "All of which has been the proximate and direct result of the carelessness, negligence and grossly unskillful manner in which defendants as aforesaid treated this plaintiff and performed said operation and cared or failed to properly care for plaintiff therein and thereafter."

This court, in Lampman v. Bruning, 120 Iowa 167, at pages 169, 170, 94 N. W. 562, at page 563, said:

"It is not then adopted because a feature of common-law pleading, but as an aid in securing definiteness and precision in the settlement of issues. 'The rules by which their sufficiency

are to be determined are those prescribed by the Code.' Code, section 3557.

"After issue is joined on the merits, notwithstanding section 2951 of the Revision of 1860 is not found in the Code. the pleadings will be liberally construed, with a view to effectuating substantial justice between the parties. * * * While nothing is to be assumed in favor of the pleader unless averred, he is to be accorded the advantage of every reasonable intendment, even to implications necessarily inferred, regardless of technical objections or informalities."

The petition does not limit the treatment to the time the appellee was in the hospital. She employed the appellants not merely to insert the knife and stitch up the wound, but to treat her until she had recovered. Appellants knew that the operation necessitated a long subsequent period of treatment in order to effect a cure. The seat of the operation required inspection and dressing, to see whether the wound was healing properly, and it was the duty and responsibility of the physician or surgeon to see to this. In this case we find that appellants, after the operation, on two occasions, took appellee to the hospital and used dilators in an attempt to keep open the cervical canal.

IV. We come now to what we believe is the main contention of the appellants: that the court erred in overruling appellants' motion for directed verdict, because there is not sufficient evidence in the record to justify the jury in returning a verdict against the appellants, and finding that appellants failed to follow the usual and ordinary practice among reasonable and careful physicians and surgeons in Keokuk and similar communities in performing the operation shown by the record to have been performed on February 17, 1934.

In O'Grady v. Cadwallader, 183 Iowa 178, 192, 166 N. W. 755, 759, this court said:

"There is no implied guaranty of results, and all the law demands is that the practitioner bring to the service of his patient and apply to the case that degree of skill and care, knowledge and attention, ordinarily possessed and exercised by practitioners of the medical profession under like circumstances and in like localities; and it is the general holding of the courts that the bare fact that full recovery does not result, or that a surgical operation is not entirely successful, is not, in and of itself,

evidence of negligence; and, in the absence of any showing from those learned in the profession that there was a failure to do that which ought to have been done in the treatment of the injury, or that there was that done which ought not to have been done in the treatment of the injury, there can be no recovery.''

With this rule of law in mind let us look at the record.

There is in this record the testimony of Dr. Frank R. Richmond, a graduate of the medical school of the University of Illinois, a physician and surgeon of years' standing, a man of experience and training, who testified that he lived at Fort Madison, in Lee county, a short distance from Keokuk, who was familiar with the usual and ordinary practice of physicians and surgeons in Keokuk and surrounding community, in conization of the outer os of the uterus where there are cysts.

This medical man testified that the procedure and method used by the Doctors Dorsey were not that ordinarily used; that it was essential that the canal be kept open—in fact, all of the medical men so testified—and in keeping the canal open various methods are used; that inspection must be made frequently to see that the canal was kept open. There is some conflict in the testimony on the part of the other doctors who testified on behalf of the appellants. Clearly, the question was one for the jury.

V. It is the claim of the appellants that the court should have given requested instruction No. 6 relating to expert testimony.

The court did give instruction No. 16, and appellants concede that is correct, but they claim that instruction No. 6 should also have been given.

It is a well-recognized rule of this court that where the trial court gives an instruction which is similar to or embodies all the principles of a requested instruction, it is not error to refuse to give the requested instruction.

In the case of Kiser v. Morton Farmers Mutual Insurance Association, 216 Iowa 928, at page 935, 249 N. W. 753, at page 756, this court said:

''The other instructions asked and refused are such as were fully covered by the court in its instructions given to the jury, and we find no error in the refusal of the court to give the instructions asked by the appellant.''

Many times this court has said that the instructions given by the trial court should be considered as a whole, and not individually. In the case of Swan v. Dailey-Luce Auto ·Co., 221 Iowa 842, at page 846, 265 N. W. 143, at page 145, this court said:

"It is the well-settled rule of law in this state that the instructions must be considered as a whole, and if, when so considered, they fairly instruct the jury upon the questions presented, there is no prejudicial error."

In reading the instructions as a whole, we find no error.

VI. Next it is argued that the court erred in failing to instruct the jury properly relative to appellee's burden of showing the necessity of removing the uterus.

It seems to be appellants' theory that the jury, in determining the matter of necessity, should only consider opinions of experts regardless of whether or not the experts themselves have fixed any standard of necessity. One physician might say that what was necessary was to be gauged by whether appellee's life depended upon a certain course. Another might think that necessity should be gauged by whether the patient's intense discomfort or pain could be avoided by the removal of the organ, which would completely eliminate that from her life. Another physician might think that preservation of the ability to bear children was more important than the risk of death or long suffering, and therefore that the patient should be subjected to a risk of death or long suffering, rather than have the uterus removed. ·Therefore, the opinion of physicians as to the mere fact of necessity is not controlling on the jury. The jury is well able to say whether the preservation of life, the freedom from long pain or suffering, or the preservation of the power to bear children regardless of the risks that might accompany it, shall be the standard of necessity. The jury must be the judges of the ultimate facts of whether it was necessary, and unless the expert testimony attempting to show that the removal was not necessary, gives the reasons of the doctors why it was not necessary, it would be an invasion of the province of the jury. This is not a question upon which experts alone have knowledge but is for the jury to determine upon the facts presented.

VII. There are several errors alleged in the admission of certain testimony. To go into each and every one of these would

extend this opinion altogether too far. Suffice it to say that we have carefully read the able brief and argument of the appellants, and the authorities therein cited, and find no error.

██ VIII. The next error alleged is the failure to strike the testimony of Dr. John Reichman of Hannibal, Missouri, in so far as said witness testified relative to the usual and ordinary practice of physicians and surgeons in Keokuk, Iowa, and similar communities relative to the operation performed in this case, for the reason that said witness is incompetent and not qualified by the record.

The evidence shows that Dr. John Reichman is a physician and surgeon located at Hannibal, Missouri, a city about seventy miles from Keokuk; that he was a graduate of the St. Louis University School of Medicine and spent three years in internship at the St. Louis City Hospital, which had 800 to 1,200 beds, as well as being resident physician of same; that he performed or supervised the performance of somewhere between 150 and 200 cervical conization operations; that he watched Dr. Crossen, one of the leading gynecologists, perform this operation several times; that he had performed a great many of these operations since being in practice at Hannibal, Missouri, and also observed these operations at Quincy, Illinois, a city located about thirty-five miles from Keokuk. He described what was the correct technique in performing these operations in localities similar to and relatively near Keokuk; and was familiar with the method used in all of these surrounding cities and towns of the same size as Keokuk. The undisputed evidence shows that he was qualified in all respects regarding his knowledge of this type of operation, and his testimony certainly shows the standard of practice of the general locality surrounding the city of Keokuk.

We find the following in the case of Whitesell v. Hill, 101 Iowa 629, at pages 636, 637, 70 N. W. 750, at page 751, 37 L. R. A. 830:

"But we are of the opinion that the correct rule is that a physician and surgeon, when employed in his professional capacity, is required to exercise that degree of knowledge, skill, and care which physicians and surgeons practicing in similar localities ordinarily possess."

In this same case the court, at page 636, 70 N. W., at page

751, quotes with approval from the case of Gramm v. Boener, 56 Ind. 497:

" 'It seems to us that physicians or surgeons practicing in small towns or rural or sparsely-populated districts, are bound to possess and exercise at least the average degree of skill possessed by and exercised by the profession in such localities generally. It will not do, as we think, to say that, if a surgeon or physician has exercised such a degree of skill as is ordinarily exercised in the particular locality in which he practices, it will be sufficient. There might be but few practicing in the given locality, all of whom might be quacks, ignorant pretenders to knowledge not possessed by them; and it would not do to say that, because one possessed and exercised as much skill as the others, he could not be chargeable with the want of reasonable skill.' "

This rule is again cited with favor in the case of Nelson v. Sandell, 202 Iowa 109, at page 111, 209 N. W. 440, at page 441, 46 A. L.R. 1447, where this court said:

"The physician is bound to bring to the service of his patient and apply to the case that degree of knowledge, skill, care, and attention ordinarily possessed and exercised by practitioners of the medical profession under like circumstances and in like localities."

To lay down a rule that no one could testify except a doctor from the particular town in which the medical man being sued lived, would indeed be unfair and unreasonable. As stated in the cases cited, the physician and surgeon is bound to exercise that skill and care ordinarily possessed under like circumstances, in like localities.

IX. It is next contended by appellants that the court erred in the admission of certain questions asked Dr. Frank R. Richmond in regard to the result which was to be expected after an operation because it tended to indicate to the jury that a bad result would show the appellants must have been negligent.

In the case of Berg v. Willett, 212 Iowa 1109, 1112, 232 N. W. 821, 823, this court said:

"The burden in this case was upon appellant to make out a case of negligence or unskillfulness by the preponderance or

greater weight of the evidence. The physician does not, in accepting employment, impliedly guarantee a cure in any case or of any disease. He is bound only to employ that degree of skill ordinarily possessed by practitioners generally under like circumstances in the locality in which he practices his profession. It is, however, one thing to say that an adverse result is not, in itself, evidence of negligence or want of skill on the part of a physician, and another to combine the result with other facts and circumstances in determining the fact question. We think it is and must be the rule that while the result alone is not, in itself, evidence of negligence, yet same may, nevertheless, be considered, together with other facts and circumstances disclosed by the evidence in a given case in determining whether or not such a result is attributable to negligence or want of skill.''

The appellants argue strenuously that the case of Hair v. Sorenson, 215 Iowa 1229, 247 N. W. 651, is controlling in the case at bar. However, in deciding that case this court quoted the rule given in the case of Berg v. Willett, supra, but, inasmuch as there was a complete recovery there, no other facts and circumstances were introduced together with the result, to determine whether or not such result was attributable to negligence or want of skill.

In view of the cases cited, the admission of the result, coupled with other evidence, was material in determining negligence or want of skill.

X. Appellants argue that the court erred in overruling the motion for new trial. It is their argument that one of the jurors, Freda Anderson, became ill and was handicapped as a juror; that during the deliberation of the jury certain matters in the nature of evidence were considered by the jury which were not a part of the record and regularly admitted; and that other statements were made in the jury room which were not duly admitted in evidence.

There were attached to the motion for new trial a great many affidavits, including one of Mrs. Freda Anderson, one of the jurors. Later, however, this same Mrs. Anderson made another affidavit. We quote from the second affidavit:

''I had before this time and during the entire time that the jury was out, been in favor of returning a verdict for the plaintiff. When asked after I had returned to the jury room after

being sick what amount I favored giving to the plaintiff I said $15,000.00. Some time thereafter one of the jurors, I think the foreman, said to me that the rest of the jury were willing to return a verdict for $7,500.00 and asked me whether this amount would be agreed to by me. I stated yes and understood at the time that that amount would constitute a verdict for the plaintiff and that a verdict for the plaintiff would be rendered in that amount."

No one can read this second affidavit and say that Mrs. Anderson was not familiar with the entire situation. She was for the appellee. In fact, the only disagreement appeared to be as to the amount. She wanted to return a verdict of $15,000, but finally agreed to the amount of $7,500. There is no showing here that Mrs. Anderson was in a critical condition; that she was unable to understand what was going on, or that she was unable to perform her duty as a juror. She was examined during the period of deliberation, at the request of the court, by a doctor, and he reported that she would be able to continue to serve as a juror.

In In re Estate of Osborn, 185 Iowa 1307, at page 1318, 168 N. W. 288, at page 291, this court said:

"The claim of the juror that he yielded to mere weariness or weight of numbers is only an impeachment of the verdict and of the juror himself, and is not permissible."

In the case of State v. Dudley, 147 Iowa 645, 652, 126 N. W. 812, 815, this court said:

"And yet in the face of this instruction eleven of the jurors made affidavits that they had considered Bishop's testimony as tending to connect the defendant with the commission of the offense. This does not obviate the correctness of the instruction which clearly advised to the contrary. These affidavits were stricken from the files, and rightly so. Jurors cannot be permitted to thus stultify themselves, and thereby impeach their own solemn findings. That the jury misunderstood the instructions if correct furnishes no ground for new trial. In Brown Land Co. v. Lehman, 134 Iowa 712, 112 N. W. 185, 12 L. R. A. (N. S.) 88, evidence had been erroneously admitted, a motion to strike overruled, and it had been commented on by counsel in their argument to the jury, and, although the court had with-

drawn the issues upon which the evidence was received, the affidavits of the jurors were admitted as showing that they had considered the evidence in reaching the verdict. The evidence was still before the jury, though improperly and it was thought the case was analogous with one where improper matters had been brought to the attention of the jurors, as in Douglass v. Agne, 125 Iowa 67, 99 N. W. 550. The distinction between such cases and those wherein the affidavit is of a matter inhering in the verdict is pointed out in the last case. Affidavits of jurors that they have been unduly influenced by their fellows, or of the reasons for assenting to the verdict, or of improper arguments resorted to in the jury room, or that they did not assent to the verdict, or that it was not the result of their deliberate judgment, or they did not understand the instructions of the court as these matters inhere in the verdict, are incompetent, and cannot be received to impeach the jury's findings.''

The affidavits in this case, attached to the motion for new trial, and to the resistance to the motion, show clearly why courts should not grant new trials simply because affidavits on the part of jurors are filed. Some of the affidavits attached to the motion for new trial are offset by affidavits by the same jurors, attached to the resistance to the motion. Verdicts and trials cannot be destroyed ordinarily by an affidavit of a juror as to what took place in the jury room. If they could be, then there would be no end to litigation.

The record is a long one. Able counsel represented both sides. The distinguished trial court properly submitted the case to the jury. It was for the jury's determination. They have spoken. There being no error, it necessarily follows that the case must be, and it is hereby, affirmed.—Affirmed.

All JUSTICES concur.