Edward Telanus v. Arthur J. Simpson and H. M. Grace, Appellants.—12 S. W. (2d) 920.

Division One, December 31, 1928.

*Kitt & Marshall* and *Brown, Douglas & Brown* for appellants.

*Roger Stone Miller* and *Scott J. Miller* for respondent.

LINDSAY, C.—I. The defendants, appellants, are physicians and surgeons, and this is a malpractice case. The charge is that the defendants operated upon the plaintiff for appendicitis, and in doing so, negligently cut nerves, tissues and muscles of plaintiff's body so that, as a result, his right leg became atrophied and useless. The defendants, in addition to a general denial, and after admitting that they were physicians and surgeons, pleaded as a bar the Statute of Limitations—the act approved March 29, 1921 (Laws 1921, pp. 197, 198). Under this statute, defendants earnestly insist that the plaintiff was barred, and that it was error to refuse their demurrer offered at the close of the case. That question is extensively discussed in the briefs. The fact constituting that issue are as follows:

The plaintiff alleged and the evidence showed that the injury occurred on the 4th day of September, 1920. His suit was filed on the 8th day of March, 1924, or three years and six months after the injury. On September 4, 1920, the date of plaintiff's alleged injury, Section 1317, Revised Statutes 1919, was in force, prescribing the limitation of five years as the period within which actions of the character therein defined should be commenced. Said section is a part of Article 9, Chapter 12. Section 1342 of said Article 9 is as follows:

"The provisions of Articles 8 and 9 of this chapter shall not apply to any actions commenced nor to any cases where the right of action or of entry shall have accrued before the time when said articles take effect, but the same shall remain subject to the laws then in force." Said articles took effect on November 1, 1919.

The Act of 1921 (Laws 1921, pp. 197, 198) amended Article 9 of Chapter 12, Revised Statutes 1919, by adding a new section thereto, to be known as Section 1319a, and is as follows:

"Section 1. Amending article IX, chapter 12, by adding new section to be known as 1319a.—Amending article IX, chapter 12; that article IX, chapter 12, of the Revised Statutes of Missouri, 1919, be, and the same is hereby amended by adding a new section thereto, to be known as section 1319a, to read as follows:

"Section 1319a. Actions shall be brought within two years.—All actions against physicians, surgeons, dentists, roentgenologists, nurses, hospitals and sanitariums for damages for malpractice, error, or mistake shall be brought within two years from the date of the act of neglect complained of.

"Section 2. Repealing conflicting laws.—All acts and parts of acts inconsistent with this act are hereby repealed."

This act went into effect on June 20, 1921. Plaintiff's suit was brought two years and eight months thereafter.

The question presented by counsel is whether, by virtue of the provisions of Sections 1317 and 1342, Revised Statutes 1919, the plaintiff had five years, after the accrual of his cause of action, in which to sue, or, whether the Act of 1921 applies and therefore, since plaintiff's action was not brought until after the Act of 1921 had been in effect for more than two years, he is barred thereby.

Counsel for appellants insist that Section 1342 has no application to the case at bar. They press the claim that the words "the laws then in force" as used in that section mean laws in force at the time Chapter 12 went into effect, and not the laws in force when the cause of action accrued, and that Section 1342 can have no bearing upon a cause of action which accrued after Chapter 12 went into effect. That section in its present form has been a part of the chapter on limitations in the successive revised statutes since 1855, and had been before that time. Then, it was Section 15 of the Limitation Act, found on page 1053 of the Revised Statutes of 1855. It was construed in Billion v. Walsh, 46 Mo. 492. The case was a real action, and the plaintiff's cause of action accrued prior to the year 1847, when she was under disabilities. In 1847, the period prescribed for bringing such an action after removal of disabilities, was shortened. The plaintiff sued in 1866, and relied upon the limitation act in force at the time her cause of action accrued, and, on said Section 15 of the Statute of 1855. It was held that the words "the laws then in force" meant the laws in force when the Revised Statutes of 1855 went into effect, and not the laws in force when the cause of action accrued. The Act of 1847, which had shortened the period, was the law in force on the subject when the Revision of 1855 went into effect. The decision was followed in Gilker v. Brown, 47 Mo. 105.

If the Act of 1921 (Sec. 1319a) had no operative effect at all upon plaintiff's cause of action, he is not barred; but, if it operated upon his cause of action so that, as to the shortened period fixed, it was operative as of the effective date of the act; or, putting it another way, if it operated, but its operation did not include the period during which his cause of action had existed prior to the time Section 1319a went into effect, but did include the period of two years after

that section went into effect, then, since his suit was not brought until more than two years had elapsed after Section 1319a went into effect, the plaintiff is barred.

Counsel for defendants have cited a large number of cases under claim that the action is barred. There is not entire harmony in the conclusions reached upon the effect of statutes shortening the limitation period; and where somewhat the same general result has been reached, different reasons have been given for such result. · In the early case of Ridgley v. The Reindeer, 27 Mo. 442, an action against a vessel, the new statute cut down the time in which to sue from twelve months to six months, and was construed as applying only to a cause of action arising after its passage. In other cases, some earlier, some later than that case, the decisions proceeded upon the theory that as statutes of limitation affect the remedy only, the statute in force at the time of the suit brought, governed the case, and in the absence of saving clauses, operated on causes of action accruing prior to its passage from the time the later act went into effect. Under this head are the decisions in Weber v. Manning, 4 Mo. 229; Callaway County v. Nolley, 31 Mo. 393; Seibert v. Copp, 62 Mo. 182. In the Callaway County case, 1. c. 398, this court said: "The construction put upon the existing statute of limitations as to real actions is, that where ten years have elapsed from the taking effect of the act, the action is barred, although it first accrued under some other act of limitations, which gave a longer period within which to bring it." The saving clause, now Section 1342, was not referred to in the Seibert and Callaway County cases. This language was quoted with approval in Seibert v. Copp. A like rule was applied in Forcht v. Short, 45 Mo. 377, and Hauser v. Hoffman, 32 Mo. 334. In the cases last mentioned the time limited for bringing suits to enforce mechanics' liens, was shortened; and where the cause of action accrued prior to the time the new act went into effect, it was held that the limitation prescribed by the new act applied.

In Cranor v. School District, 151 Mo. 119, the suit was one brought upon a judgment. The case was one certified to this court by the Kansas City Court of Appeals, 81 Mo. App. 152. The cause of action accrued while the Statute of 1879 was in force, fixing the limitation period at twenty years. The Statute of 1889 was the same. The suit was brought three years after passage of the Act of 1895, which, by its terms, barred all judgments after ten years; and, if the Act of 1895 applied, the plaintiff's cause of action was already barred. It was held that there was nothing in the act to indicate that it was retrospective, and if there was, as to the plaintiff's right of action, it would be unconstitutional. It was held that plaintiff's cause of action would not become barred until the expiration of twenty years after the date of the rendition of the original judgment.

Tice v. Fleming, 173 Mo. 49, was also an action upon a judgment, and the same conditions existed as in the Cranor case. In the Tice case it was said, l. c. 55: "While it may be conceded that the Legislature may shorten the statutory period in which actions are to be prosecuted, yet as to the shortened period fixed, such statute can only be operative after the passage of the act. In other words, the Legislature is not authorized to make a statute of limitation retrospective in its operation, and include the period of existence of the cause of action prior to the enactment of the statute." Reference was then made to the holding in Seibert v. Copp and Callaway County v. Nolley, as announcing "the doctrine that where the action accrued under a former statute and subsequently the statute is changed, fixing a different period, before the action is barred, the full period must elapse as fixed by the later statute." Reference was then made to the Cranor case, and the decision in that case was construed as a ruling that the Act of 1895 could have no application to judgments rendered prior to its enactment. The difference between the cases of Tice and Cranor and the instant case, is, that in those cases the ten years, the time constituting the limitation period as prescribed by the later act, had already elapsed when the act was passed, while in the case at bar a period of more than one year remained under the new act in which plaintiff could have brought his suit. The Kansas City Court of Appeals in its opinion in the Cranor case made reference to the section in the Limitation Act, now Section 1342, Revised Statutes 1919. Judge ELLISON, writing the opinion said, 81 Mo. App. l. c. 153:

"It will be noticed that the Act of 1895 does not allow any period for bringing actions already accrued. So that if the statute be construed literally, a judgment which had been rendered and on which an action might have been brought for a period lacking a day of being ten years, there would be a single day in which to institute suit. Or if a judgment had been rendered more than ten years at the date of the statute, no action could be brought on it at all. Evidently the reason why no provision was made in the new enactment altering the period of limitation, was from the fact that the limitation statute (Section 6797) made it unnecessary. It provides: 'The provisions of this chapter shall not apply to any actions commenced nor to any cases where the right of action or of entry shall have accrued before the time when this chapter takes effect, but the same shall remain subject to the laws then in force.' The law in force at the time the action in hand accrued was, as before stated, the twenty-year period. So that it is clear, under the terms of the statute itself, the present action was not barred. [See Neilson v. County of Chariton, 60 Mo. 386.]

"But since the act here was passed subsequent to the enactment of the chapter on limitations, it may be suggested that the section last quoted does not apply. That is to say, it may be thought the section quoted only applied to actions which had accrued (in the language of the section) when the chapter took effect. But as the enactment of the law of 1895 was amendatory of the limitation chapter of the general statutes, the section in the Act of 1895, by the terms of the act, was 'enacted in lieu thereof.' This made of the new section a part of the chapter and subjected it to the provisions of Section 6797, above set out."

In this court no direct reference was made to the foregoing considerations, but the opinion, at page 154, does refer to the decision in Neilson v. County of Chariton, 60 Mo. 386, wherein reference was made to what is now Section 1342, but under circumstances somewhat different from those present in the Cranor case. There, the plaintiff's cause of action accrued before the revised act took effect.

McFaul v. Haley, 166 Mo. 56, was a proceeding to have allowed and classified by a probate court, a judgment, which had been rendered on December 5, 1878, and was not presented to the probate court until three years after the Act of 1895 went into effect. The action was held not to be barred, and in reaching that conclusion effect was given to Section 6977, Revised Statutes 1889, said section being identical with Section 1342, Revised Statutes 1919. After reference to Section 6796 of the Statute of 1889, which prescribed the period of twenty years, and to the repeal thereof and substitution therefor of the Act of 1895 cutting the period down to ten years, this court said, l. c. 63: "The Act of 1895 took the place of Section 6796 and became a part of that chapter, and subject to the same conditions that the section it had taken the place of had been subject to. The chapter, so far as its amended fea'ure was concerned, took effect when the amendatory act took effect, and, hence, by its very terms did not apply to a cause of action then in existence, bu' such cause of action was to remain subject to the laws in force when it accrued. The judgment in question, which was the plaintiff's cause of action, was in existence when the Act of 1895 was passed, and comes within the expressed exception, and is therefore governed by Section 6796 as it appears in the Revised Statutes 1889. Under the provisions of that section the plaintiff's judgment was not barred nor was it under the ban of the statutory presumption of payment in June, 1898, when it was presented to the probate court."

The Act of 1921 makes no reference to existing causes of action and contains no saving clause. It fixes the time of the occurrence of the injury complained of as the beginning of the period. In express terms and in its effect, it is amendatory of Article 9, and creates out of those included in Section 1317, a class of persons to whom the

new limitation should apply. Under the construction given in the McFaul case, Article 9, so far as the amendatory feature was concerned, took effect when the amendatory Act of 1921 went into effect and thereby the new act did not apply to a cause of action then in existence, but that cause was to be governed by Section 1317, the law in force not only when the cause of action accrued, but also in force at the time the act amendatory of the chapter took effect. There is this difference between the instant case and the McFaul case. In that case, the full period of ten years prescribed in the amendatory Act of 1895 had not run from the time that act went into effect; while here, the full period of two years prescribed by the amendatory act had run after that act took effect before plaintiff's suit was brought. But, the conclusion reached in the McFaul case upon the grounds there stated, makes the older statute apply in this case. The grounds there stated exist in this case. It is a question of construction, and therein, of judgment between a construction that by the later statute shortening the period without a saving clause, the period prescribed by the new statute began to run when it went into effect and governs the case, or, the construction that the general saving clause expressed in Section 1342, by virtue of the amendatory character of the new act, has application to causes existing at the time the new act went into effect. The latter construction is adopted in the McFaul case, of the conjoint effect of Section 1342 and the amendatory act upon a cause of action accruing before the effective date of the amendment. The construction given applies to a statute, which, in the same form, has been preserved in the successive revisions beginning with the revision of 1855. The McFaul case, so far as we have been able to find, has not been overruled or criticised in respect to the conclusion reached upon this question. It states the law applicable to the instant case. The case is cited and followed upon this point in Remmers v. Estate of Wolf, 206 Mo. App. 159. Reference is also made to Section 1342 in Brown v. Grinstead, 252 S. W. 973, a case in the Springfield Court of Appeals, and in Ingram v. Poston, 260 S. W. 773, a case decided by the St. Louis Court of Appeals. However most of what is said in the opinions in these last mentioned cases concerning the force of Section 1342, was unnecessary to a decision of the case.

Counsel for appellants have called attention to the decision in Falvey v. Hicks, 315 Mo. 442, 462, and also to Belfast Investment Co. v. Curry, 264 Mo. 483, 498. It may be observed as to both of these cases that they were proceedings under the statute for assignment of dower, a statute not a part of Chapter 12, Revised Statutes 1919. Section 1342, by its terms, seems to have application only to cases arising under and subject to the provisions of Articles 8 and 9 of Chapter 12, Revised Statutes 1919. The conclusions reached in Cranor v.

School District, supra, and Tice v. Fleming, supra, upon the grounds stated in the opinions in those cases, involve nothing overcoming the conclusion reached in the McFaul case. On that account we hold that the demurrer of the defendants were not sustainable upon the ground that plaintiff's cause of action was barred by the Act of 1921.

II. The next contention made by defendants is that, upon the merits, the plaintiff failed to make a case; that the evidence failed to show any injuries sustained by the plaintiff as the result of any negligent acts of defendants; and that, as to defendant Grace, no case was made for the reason that, although the defendants were partners, they were not sued as such. and the operation was performed by defendant Simpson; and that defendant Grace took no part in it except to administer the anaesthetic, and was guilty of no act of negligence.

Preliminary to statement of the evidence, the allegations of negligence are set out. Plaintiff alleged that he was advised by defendants that he was afflicted with appendicitis and that an operation was necessary, and that he submitted himself to an operation for that trouble; and charged "that the defendants so unskillfully and negligently conducted themselves, in and about the performance of the operation, that through their negligence and unskillfulness in the performance of such operation, nerves, muscles, blood vessels, tendons, arteries, veins, tissues and other parts of his anatomy were wrongfully, unskillfully and negligently cut and thereby destroyed, and the cutting of the parts was so unnecessary, unskillful and negligently done, causing atrophy of his right leg, and causing it to be useless," etc.

There is no dispute but that the condition of atrophy resulted from the condition of the anterior crural nerve. The real question was what produced the condition of that nerve. Upon the trial, plaintiff's theory was, and his evidence as to the cause of his injury, was all directed to the effort to show, that the anterior crural nerve was cut, in the operation. Defendants denied the anterior crural nerve was cut in the operation, and their claim was that the atrophy of plaintiff's leg was caused by a neuroma, that is, a tumor of that nerve, existent when the operation was performed. The explanation of this comes later.

The plaintiff grew up in the community near Chillicothe, Missouri, but some months before the operation became a resident of Kansas City, and had a clerical position in the packing plant of Morris & Company. He testified that in July and August, 1920, he suffered pain in the pit of his stomach, and consulted two physicians in Kansas City, Dr. Hoxey and Dr. Ayres. He said they told him he did not have much the matter with him. The deposition of Dr.

Hoxey, taken by plaintiff, was introduced in evidence by him. The doctor stated that he examined plaintiff about August 5, 1920, and his condition indicated that he had appendicitis. In describing the condition he found, the Doctor, among other things, said: "The patient kept his right leg bent." The plaintiff, because the pain continued, went home at the instance of his father, and went to see Dr. Grace, who, it appears, was the family physician. He went to the office of defendants, and both defendants examined him. After an examination and taking of an X-ray picture, they decided that plaintiff had appendicitis, and that he should be operated upon. On the morning following, the operation was performed by Dr. Simpson, Dr. Grace being present and administering the anaesthetic. The plaintiff testified to the effect that when he went to the operating room there was nothing wrong with his right leg, and that after the operation or when he came out from under the influence of the anaesthetic, his right leg was numb: "I discovered that my leg was numb and I could not move it up, and the first thing I said: 'They have cut a nerve in my leg.'" He further stated that he told the nurse, and told Dr. Grace and Dr. Simpson, later. He testified that after the operation, he was compelled to use crutches for about six months and then walked with a cane for about one year. In about one and one-half years after the operation he discarded the cane; but the evidence showed atrophy and a lack of control of the muscles for extending the leg. Plaintiff told of a conversation with defendant Simpson, which, on his cross-examination, he said occurred about a year and a half after the operation, and said that in this conversation Dr. Simpson told him he did not know what caused the diseased and atrophied condition of the leg, but admitted to him that the leg was in a bad condition. Plaintiff stated that in his conversation with Dr. Simpson he said to the Doctor, "You have got me in an awful bad shape," and that Dr. Simpson replied, "Yes." Plaintiff testified also that for a time, at intervals after the operation, Dr. Grace treated him electrically; and that upon an occasion, about a year and a half after the operation, the following occurred: "Dr. Grace said: 'Well, how are you, Ed?' and I says: 'I am in the same fix. I don't think I will ever get well, do you?' and he says: 'No, I don't think you will.' He says: 'That nerve has been cut and there is no question about it.'"

Henry Telanus, the plaintiff's father, testified that he was present when the operation was performed; that Dr. Grace administered the anaesthetic, and the operation was performed by Dr. Simpson; that while the operation was being performed, Dr. Simpson stopped and looked at Dr. Grace, and said something like, "Will we go ahead?" that Dr. Grace made no answer; that Dr. Simpson appeared to be nervous, but that nothing further was said and he pro-

ceeded with the operation; that after the operation had been performed, the plaintiff after becoming conscious, complained of lack of sensation in his right leg and said: "My leg, I aint got no feeling; something wrong." This went in without objection. The witness on further question said every time afterward when he saw plaintiff, while still in defendants' hospital, he would say: "Papa, I believe I have lost my leg." Objection was then made, and sustained as to what plaintiff said, but not as to the fact he complained. This statement made by plaintiff to his father was not made in the presence of defendants. This witness also testified that he was present when the plaintiff had the conversation with Dr. Grace, and that at that time plaintiff told Dr. Grace that his leg was getting worse, and Dr. Grace said the nerve was cut. Witness said there was no more then said about it.

Aside from the plaintiff and his father, the nurse who attended at the operation, and the packing superintendent of Morris & Company, all witnesses on both sides, were medical witnesses. On most questions, there is no substantial disagreement in the testimony of the medical witnesses respectively produced. In the testimony there is described the location of the appendix as found in ordinary cases, and the location of the anterior crural nerve and its functions. According to this testimony the appendix lies between the posterior and anterior walls of the peritoneum, and in ordinary cases is located under the middle point of a line drawn from the navel to the top of the right hip joint. It may be said now that there is no testimony that plaintiff's appendix was not found at the normal place. The anterior crural nerve lies entirely behind the peritoneum. It is both sensory and motor in character; supplies sensation and motive power, or impulse, to the anterior muscles of the leg. By its severance, or injury, sensation and control of those muscles is destroyed or impaired. In the ordinary operation for appendicitis the anterior crural nerve is not reached or affected. In the operation upon the plaintiff, the incision made extended farther down the abdomen toward the groin than in ordinary cases. Some of the medical witnesses said it extended an inch or more beyond the ordinary. The explanation of this, made by defendants and based upon what they testified they found to be the condition of the plaintiff when preparing him for the operation, was, that in their examination before the operation, they found a lump or mass in plaintiff's abdomen, situated down toward the groin, and their decision was that this lump or mass should be explored or investigated to ascertain whether it contained pus, and the testimony of other medical witnesses was that if such lump or mass existed, it was proper, and good practice under the circumstances, to reach it, and explore it so that if it contained pus it might be drained. The testimony of defendant Simp-

son was that he did reach and explore a lump in plaintiff's abdomen, and ascertained that it did not contain pus. He said the lump was about the size of a walnut; that it was a neuroma, a tumor of the anterior crural nerve. He stated emphatically that he did not cut the nerve at all; that he did not use a knife upon the nerve or the lump; that surgeons do not cut with a sharp instrument around dangerous places; that he made this exploration by dissection with his fingers, wearing rubber gloves, and working loose the tissues with dry gauze; that he discovered the lump did not contain pus, but was a lump composed of nerve tissues, an enlargement of the nerve; that having discovered this, he abandoned the lump; did not cut into it, but proceeded to open the peritoneum and remove the diseased appendix, after which he closed the wound, and said that plaintiff "made an uneventful recovery."

Plaintiff's witness, Dr. Carpenter, who examined the plaintiff on the day of the trial, testified that he could feel an adhesion or small lump under the lower end of the incision made by Dr. Simpson; that he could not swear that it was a neuroma. In effect, his testimony was that a neuroma could be caused by many things; a cutting of, or injury to, the nerve, or incision, disease, or many causes, not all of which are known to physicians. He further testified that an adhesion could cause the condition or enlargement which he felt in plaintiff's abdomen, and that it could have been caused by scar tissue.

Dr. Tichenor, the plaintiff's witness, testified that upon the examination made at the time of the trial, he found an atrophied condition of plaintiff's right leg and loss of motion and sensation of the leg, and said that something had occurred to the anterior crural nerve to cause the disability from which the plaintiff was suffering. He said that assuming that plaintiff's leg was in normal condition at the time of the operation, and that numbness and loss of sensation followed immediately, or shortly after the operation, that condition would indicate "something occurred to the anterior tibial nerve; that there could be several things." In his examination of plaintiff at the time of the trial, he found a small mass, "in the region of the anterior crural nerve." He gave it as his opinion that this condition or mass was a neuroma. He said: "A neuroma may form in a very few weeks. It may take several months or longer. They are exceedingly variable." He testified that if the plaintiff had a swelling, or growth, below the appendix, of a character which was not definitely known when the operation for appendicitis was to be performed, the incision should be made close enough to the swelling to explore the mass or lump, and that in appendicitis, appendicial abscesses are sometimes found, which form between the colon and the lateral wall of the peritoneum, and which may be pretty well down; in such cases the practice was to make the incision close over so as to

drain the abscess, without cutting into the peritoneal cavity. He stated that it would not have been good practice had defendants cut the anterior crural nerve, while attempting to remove the appendix. His statement was that a neuroma on the anterior crural nerve could very well cause the condition from which the plaintiff was suffering; that had that nerve been entirely severed, the muscles of the leg would have become inactive and there could have been no voluntary motion.

III. Before proceeding to a conclusion upon the question whether plaintiff made any case at all, we must consider the contention of appellants that in any event the demurrer offered by defendant Grace should have been sustained, because, it is urged, the evidence shows he took no part in the operation, and was guilty of no act of negligence; was not sued as a partner; and could not have been held liable for any alleged act of negligence on the part of defendant Simpson. Connected with this, is the contention that the statement of plaintiff that Dr. Grace told him "the nerve" had been cut, was not competent for any purpose—was not competent against Grace on the theory that he was not responsible for the act of Simpson, and not competent against Simpson because the latter was not present when the statement was made; and also, that the statement was no more than the expression of an opinion by Dr. Grace, and did not tend in any way to show the anterior crural nerve was cut. On the question of the admissibility of this statement as evidence to be considered against defendant Simpson, we are cited to several cases: Chawkley v. Wabash Railway, 297 S. W. 20; Holt v. Williams, 240 S. W. 864; Hinson v. Morris (Mo. App.), 298 S. W. 254. There are several things to be considered in reference to the foregoing contentions. The statement referred to went in evidence without objection on the part of either defendant. In its terms, it cannot be said conclusively that it was an expression of a mere opinion. It is argued that it was a statement merely that *some* nerve was cut. But, the statement is attributed to defendant Grace in a conversation about the condition in which the plaintiff was, and it might be reasonably assumed that Dr. Grace, in the making of the statement, knew, as a physician, that the condition was one which could be caused by the cutting of the anterior crural nerve. Next, as to the responsibility of Dr. Grace for the alleged negligent acts of Dr. Simpson: Counsel for appellants say there is no such responsibility, under the evidence, and under the rule stated in certain cases cited: Nelson v. Sandell, 209 N. W. 440; Jett v. Linville (Ky.), 259 S. W. 43; Brown v. Bennett, 122 N. W. 305; Stokes v. Long, 159 Pac. 28.

In Nelson v. Sandell, supra, it was said.: "It is well settled that, generally speaking, a physician who merely administers an anaesthetic to a patient who is operated on by another is not liable for the negligence of the operating surgeon."

In Stokes v. Long, supra, is the following: "It is held also that where two physicians are employed on the same case and by agreement divide the service as their best judgment may dictate, they are considered as independent agents, each being responsible for his own negligence and no more." The like rule may be found stated in Morey v. Thybo, 199 Fed. 760, 42 L. R. A. (N. S.) 785, and other cases.

The applicability of the rule must depend upon the facts of the particular case. The relation of the two defendants is to be considered in view of the evidence, and also of the theory and manner of the trial of the case. The petition did not allege that they were partners, but charged both with commission of the negligent act. They filed a joint answer. At the close of all the evidence defendant Grace offered his separate demurrer, which being refused, he joined with defendant Simpson in offering a joint demurrer. On the cross-examination of plaintiff, counsel trying the case for the defendants, cross-examined the plaintiff concerning the circumstances, and the fact that both defendants examined him prior to the operation; that plaintiff went to Dr. Grace, and he called in Dr. Simpson "right along at that time." Then follows:

"Q. They were both associated together? A. Yes.

"Q. As partners? A. Yes."

When Dr. Grace took the stand to testify, in stating the circumstances under which plaintiff came to him, he said, among other things: "We were, my son and Dr. Simpson and myself, were partners." He then stated that his son was in Colorado on his vacation; that he called in Dr. Simpson to see if he would verify what he, Grace, found. He then told of the swelling in the plaintiff which he said he could feel. He continued: "And I could see a swelling there, and in my opinion it was a part of the diseased condition occasioned by the appendix, and in my opinion the pus had gravitated there and more than likely we would find some pus in that region. That was my opinion about it. . . . And, I told Dr. Simpson that is what I thought; but, I was mistaken and it wasn't pus." Farther along in his direct-examination he said: "And Dr. Simpson and I had discussed about the lump before the operation, and at the beginning of the operation I remember of him pausing before he made the incision, and speaking about it, and feeling of it, and examining it, and said: 'The proper thing to do is to cut down here a little low on account of this lump;' and, if it was pus in there, why the proper thing to do would be to drain it; and he made the

incision and removed the appendix after he made the incision and examined that lump.'' It is thus apparent that the defendants themselves voluntarily thrust into the case the fact that the relation of partners existed between them. Under the facts it is not an instance of two physicians, independently employed, the one to perform the operation, the other to administer the anaesthetic, or independently employed and making a division of service according to their own ideas. Nothing appeared in the record tending to show a defense severally made, according to any asserted respectively different relation, except, and until when, at the close of the case, Dr. Grace offered his separate demurrer. Under the circumstances we must hold that the contentions made under this head cannot be allowed.

The charge of negligence made against defendants was specific, in that, plaintiff alleged that defendants ''cut and thereby destroyed nerves, muscles, etc.'' causing atrophy and loss of the use of his leg, and all of his evidence was designed to show that it was the anterior crural nerve which was cut. Under his evidence, and indeed all the evidence, his condition was solely referable to the condition of the anterior crural nerve—its failure to function properly. These circumstances make the condition of plaintiff's anterior crural nerve at the time the operation was begun the crucial question in the case. This is so, because, if at the time, there was a neuroma of that nerve, a lump, or a mass of adhesions affecting its functions, such condition, according to the medical evidence, explained plaintiff's subsequent condition of atrophy and loss of control of his leg. The evidence as to plaintiff's condition at the time the operation was begun is of peculiar importance. Plaintiff's witness Dr. Hoxey, who examined him on August 5, 1920, one month before the operation, testified that at that time there was a tenderness of the lower right quadrant of plaintiff's abdomen indicating appendicitis; but, he said also that his record of that examination showed ''nothing in the line of a swelling—simply some tenderness at that time.'' Further speaking of plaintiff's condition at that time, he said: ''The patient kept his right leg bent.'' Dr. Hoxey saw plaintiff the next time on October 16th, several weeks after the operation. He said that plaintiff then told him of the operation had on September 4th, and that plaintiff said ''the surgeon had taken out two fecal stones, but that he was tender or his leg was numb, and that he could not straighten out his knee.'' Dr. Hoxey was not asked by either party whether he detected a swelling or lump in plaintiff's abdomen on October 16th. Plaintiff's witness, Dr. Tichenor, made his first examination of plaintiff also on October 16, 1920. After stating, on cross-examination,

that it was possible for a neuroma to start its growth after August 5, 1920, and exist on September 4, 1920, the defendants, in immediate further cross-examination, brought out from him the fact that he did not, on October 16th, discover a neuroma. He said: "I palpitated that region. I didn't disclose a tumor at all." Immediately after that answer, the following occurs:

"Q. Did you make any special examination looking for a neuroma at that time? A. The only special examination we have to look for one, is our fingers.

"Q. Did you make an examination? A. Yes.

"Q. Specially looking for one? A. I made an examination of that region and I didn't feel a neuroma then.

"Q. Were you looking for one at that time? A. I was making a general examination.

"Q. Did you have in mind, Doctor, at that time, a neuroma? A. Not necessarily."

Plaintiff's other witness, Dr. Carpenter, said a skillful physician might fail to detect a neuroma in making an examination. The other evidence upon this which we call the crucial question in the case, is that of the plaintiff to the effect that before the operation he had observed nothing wrong with his leg, and immediately thereafter he felt numbness, and noticed the loss of sensation and motion in his right leg; and the testimony, to which reference has already been made, of the plaintiff and of his father, as to the alleged statement of Dr. Grace that the nerve had been cut, and the statement of defendant Simpson in reply to plaintiff's statement that he, Simpson, had got plaintiff in a bad fix. The foregoing, sufficiently indicates the evidence upon which plaintiff relies under the allegations of his petition, and under his contention that the anterior crural nerve had been cut.

Counsel for defendants insist that the demurrer to the evidence should have been sustained for the reason that the condition of plaintiff's anterior crural nerve and consequent loss of control of the muscles of his leg and atrophy of the muscles, could have resulted from disease of that nerve, or without there having been a cutting of the nerve; that there is not sufficient proof that the nerve was cut, to take the case to the jury; and, that submission of the case was leaving it to the jury to arrive at its conclusion that the anterior crural nerve was cut, solely by conjecture and by guessing. Many cases are cited under the particular circumstances of which it was shown the injury might have resulted from two or more possible causes, for one of which plaintiff was not liable, and there was failure of proof that the injury was due to a cause for which the defendant was liable. Some of these we mention: Moon v. St. Louis Transit Co., 247 Mo. 227; Dyer v. W. M. Sutherland Building &

Contracting Co. (Mo. App.), 258 S. W. 48; State ex rel. Bush v. Sturgis, 281 Mo. 598; Courter v. Chase & Son Mercantile Co. (Mo. App.), 266 S. W. 340; Mullery v. Missouri & Kansas Telephone Co.; 180 Mo. App. 128, and others of like character. The burden was on the plaintiff to show negligence of defendants, and, in this case, a cutting of the anterior crural nerve, because there is no evidence of cutting or injury of any other nerve which would or could produce such a condition as that from which plaintiff suffered. Therefore, the only serious question is, whether the evidence warranted submission to the jury of the issue that defendant cut that nerve. This is so, because, according to the evidence for both plaintiff and defendants, the cutting of that nerve in the operation for appendicitis was not proper practice, and because also, a cutting of it could and would produce the condition from which the plaintiff suffered. The question is a close one, but our conclusion, from all the testimony, is that the trial court did not err in overruling the demurrer to the evidence. In reaching that conclusion we consider, among other things, the fact that defendants testified that there was a neuroma or lump —defendant Simpson said a lump the size of a walnut—at the time the operation was performed, which was reached and explored; and the other testimony to the effect that Dr. Hoxey, in his examination, about one month before the operation, found no lump, and Dr. Tichenor in his examination about one month after the operation found no lump; and, we have further taken into consideration the testimony of the plaintiff and of his father as to his condition before and immediately after the operation, and the statements by them attributed to the defendants.

IV. The next ground of complaint is against the instructions given for the plaintiff. These instructions, other than that upon the measure of damages, are as follows:

"1. The court instructs the jury that one who holds himself out to the public as a physician and surgeon, the law implies a promise and duty on his part that he will use reasonable skill and diligence in performing an operation upon those who may employ him. Therefore if you so find and believe from the evidence that plaintiff employed Drs. Simpson and Grace to perform an operation upon himself for the purpose of removing his appendix, and you further find and believe from the evidence that said operation was performed in a negligent and careless manner as defined in these instructions, and that by reason of said negligent, careless and unskillfulness if you so find, the plaintiff was carelessly and negligently cut, wounded and injured in the performance of said operation by said defendants, Dr. A. J. Simpson, or Dr. H. M. Grace, then if you so find the

facts to be from the evidence, you should find for the plaintiff against the defendants Dr. A. J. Simpson and H. M. Grace.

"2. By reasonable skill and diligence as used in these instructions is meant that skill and diligence which is usually possessed and exercised by ordinarily skillful surgeons in the community in which such operation was performed.

"3. The court instructs the jury that if you find and believe from the evidence that the defendants, Dr. A. J. Simpson and Dr. H. M. Grace, were employed by the plaintiff to perform an operation upon him for appendicitis, and that said defendants agreed to perform said operation, then it was their duty to exercise the degree of skill possessed and exercised by ordinary skillful surgeons in the community in which it was performed, in performing such operations under like circumstances, and if you find and believe from the evidence that the said defendants performed said operation, and that in doing so, if you find they did, that the said defendants failed to exercise the degree of skill possessed and exercised by reasonably skillful surgeons in the community, in performing such an operation under like circumstances, if you find they did, then if you so find the facts to be from the evidence, you would be warranted in finding that said defendants were negligent, as that term is used in these instructions.

"4. The court instructs the jury that if you believe and find from the evidence that the defendants, A. J. Simpson, performed an operation, assisted by H. M. Grace, in removing the appendix of the plaintiff, and that the defendants in performing said operation, if they did, did so in a negligent and unskillful manner, if you so find they did, and that as a result of said negligence and unskillfulness on the part of said defendants, if you so find, the right leg of the plaintiff was unnecessarily and negligently injured, and atrophied, if you so find, then your verdict should be for the plaintiff."

An objection, common to all of these instructions, is, that none of them should have been given as against defendant Grace, on the ground that there is no evidence to support a finding against him. This is on the theory that the petition did not allege a partnership between defendants, and that defendant Grace did no more than to administer the anaesthetic. As we have stated, both defendants testified on their direct examination, that they were partners, and they had already brought out that fact on the cross-examination of the plaintiff. The petition charged that the defendants undertook to perform the operation and did perform it. The evidence not only showed they were partners at the time, but the circumstances under which they examined the plaintiff and undertook to perform the operation tended to show they undertook it in their relation as partners. It is true that there was no allegation

of partnership, but the principle that evidence is admissible to show partnership between defendants, without an averment of partnership in the petition, is established by a long line of decisions of this court and the courts of appeals. [Gates v. Watson, 54 Mo. 585; Stix v. Mathews, 63 Mo. l. c. 374; Fellows v. Jernigan, 68 Mo. 434; Smith v. Cain, 180 Mo. App. l. c. 461.] That objection to the instruction is overruled.

Defendants make an objection to plaintiff's instructions 2 and 3 which is common to both of them. The complaint is that these instructions, instead of instructing the jury as to the care and skill defendants should have exercised in the performance of the operation, instructed the jury as to the skill which should have been possessed by defendants, when they were not charged in the petition with being unskillful or incompetent. The two instructions mentioned do not, as plaintiff claims, instruct the jury as to the skill that should have been possessed by the defendants. In that respect they put no greater duty on the defendants than that they should have exercised the degree of skill ordinarily possessed and exercised by surgeons in the community in which the operation was performed. The rule as to a physician or surgeon is thus stated, 30 Cyc. 1570: "He is only required to possess and exercise that degree of skill and learning ordinarily possessed and exercised by the members of his profession in good standing, practicing in similar localities, and it is his duty to use reasonable care and diligence in the exercise of his skill and the application of his learning, and to act according to his best judgment." Many cases are cited in support of the text, among them, McMurdock v. Kimberlin, 23 Mo. App. 523.

Plaintiff's Instruction 1 permitted the jury to go beyond the limits of the pleadings and the evidence. The specific act of negligence alleged in the petition was cutting nerves, muscles, etc. The only evidence or suggestion of negligent cutting was of the anterior crural nerve. The instruction runs that "if the jury believes from the evidence that said operation was performed in a negligent and careless manner, as defined in these instructions, and that by reason of said negligent, careless and unskillfulness, if you so find, the plaintiff was carelessly and negligently cut, wounded and injured in the performance of said operation by said defendants," then the finding should be for the plaintiff. The instruction is confusing. The petition did not charge defendants with being incompetent or unskillful in a general sense, yet this instruction seems to charge them with unskillfulness, and we think at least would raise in the minds of the jury the question whether they were to consider merely an unskillful performance of this par-

ticular operation, or a general unskillfulness, or want of skill, on the part of the defendants.

Instruction 4 is clearly erroneous. It is to be observed that Instruction 1 submitted the question that plaintiff was "carelessly and negligently cut, wounded and injured" in the performance of the operation. But, it did not require a finding of a cutting of any specific nerve or tissue. In none of plaintiff's instructions was there submitted the question whether the anterior crural nerve was cut; and in Instruction 4, the jury were not limited to the question of cutting of the anterior crural nerve or of any nerve, or to cutting plaintiff at all, but it assumed to cover the case, and it authorized a verdict for plaintiff if the jury found that defendants performed the operation in a negligent and unskillful manner and that as a result of said negligence and unskillfulness on the part of defendants plaintiff's right leg was unnecessarily and negligently injured and atrophied. This instruction permitted the jury to go at large for a finding of negligence on the part of defendant.

Plaintiff's Instruction 4 is to be considered in connection with defendant's Instruction 6 which is as follows:

"6. The court instructs the jury that before the plaintiff can recover in this case he must show by the preponderance of the evidence, that is, by the greater weight of the evidence, that the condition of plaintiff's right leg was caused solely by defendant, A. J. Simpson, cutting the anterior crural nerve of plaintiff and if you find that he did not cut said nerve or that the condition of plaintiff's right leg resulted from any other cause, your verdict must be for the defendants."

The meaning of said instruction was that to find for plaintiff it was necessary for the jury to find that defendants cut plaintiff's anterior crural nerve.

Under plaintiff's Instruction 1, it was necessary to find that the plaintiff had been negligently cut, wounded and injured. But, under plaintiff's Instruction 4 it was not necessary to find that any nerve or muscle of plaintiff has been negligently cut. It authorized a verdict for plaintiff without giving the jury any guidance as to a specific act which would constitute negligence, and without requiring a finding of any specific act of negligence, and permitted them to base finding for plaintiff on any theory of negligence they might evolve out of their own minds. On that account it was erroneous. [Owens v. McCleary, 313 Mo. l. c. 224; Allen v. Mo. Pac. Ry. Co., 294 S. W, 87.]

Instruction 4 went outside of the pleadings and the evidence. Under that instruction, the jury was not confined to a finding as to a cutting of the anterior crural nerve, the only act of negligence which plaintiff's evidence tended to show, nor confined to the negligent cutting of any nerves, muscles, etc. within the allegations of the petition; but they were authorized to find for the plaintiff if his leg was in any way negligently injured and atrophied. In thus going beyond the limits, prescribed by the petition, and the fact which plaintiff's evidence tended to show as to the particular act causing the injury, there was error. "Instructions must be within the purview both of the pleadings and the evidence." [State ex rel. v. Ellison, 270 Mo. l. c. 653; State ex rel. v. Daues, 284 S. W. 463, 464.] These instructions are conflicting, and clearly the giving of Instruction 4 was prejudicial to defendants.

Defendant's Instruction 6 in its legal substance required the jury to find for defendants, unless the jury found from the preponderance of evidence that the condition of plaintiff's leg resulted from the injury complained of, rather than from the other causes which would account for it, and of which there was evidence. Since there was prejudicial error in plaintiff's Instruction 4, it is not cured by the giving of defendant's Instruction 6 over defendant's exception. [Patterson v. Evans, 254 Mo. l. c. 303; Bollinger v. Curtis Mfg. Co., 249 S. W. l. c. 910.]

Defendants also complain of plaintiff's Instruction 5 upon the measure of damages on the ground that the instruction authorized an award of damages to plaintiff for the pain and mental anguish suffered by him "as a result of said injury," without in any way specifying the injury referred to, and that the jury was authorized to award plaintiff damages for the physical pain and mental anguish suffered as a result of the operation for appendicitis. As the instruction is drawn it is not as definite as might be, but for the errors and the reason foregoing, especially applicable to plaintiff's instruction 1 and 4, the judgment is reversed and the cause remanded. *Seddon* and *Ellison, CC.,* concur.

PER CURIAM:—The foregoing opinion by LINDSAY, C., is adopted as the opinion of the court. All of the judges concur.