Jewel RAUSCHELBACH and Loran R. Rauschelbach, (Plaintiffs) Appellants,

v.

A. V. BENINCASA and Jean J. Merz, Defendants,

Jean J. Merz, (Defendant) Respondent.

No. 49884.

Supreme Court of Missouri,

Division No. 1.

Nov. 11, 1963.

Guilfoil, Caruthers, Symington & Montrey, John P. Montrey, St. Louis, for (plaintiffs) appellants.

Robert W. Henry, Clayton, for defendant, Jean J. Merz (respondent).

WELBORN, Commissioner.

Jewel and Loran R. Rauschelbach, husband and wife, instituted this action against Dr. A. V. Benincasa and Dr. Jean J. Merz for damages for injuries which were alleged to have resulted from negligence of the defendants in the performance of a surgical operation on Jewel Rauschelbach. In Count I of the petition, Jewel sought damages in the amount of $50,000 and in Count II, her husband asked damages of $10,000.

At the trial, a motion for directed verdict as to Doctor Benincasa was sustained at the conclusion of the plaintiffs' opening statement. No objection to that action is here involved. The claim against Doctor Merz was submitted to a jury which returned a verdict in his favor upon both counts of the petition. After an unavailing motion for new trial, the plaintiffs appealed to this court. We have jurisdiction of the appeal because of the amount in controversy. In this opinion, the parties will be referred to as they appeared in the trial court.

Plaintiff Jewel Rauschelbach entered Faith Hospital in St. Louis on January 8, 1959, as a patient of Doctor Benincasa, a general practitioner "tending towards general surgery," to undergo a hysterectomy.

Prior to her admission, she had no abnormality in her voice. An examination by Doctor Benincasa, after her admission to the hospital and prior to the surgery, revealed no vocal abnormality and no upper respiratory disorder.

Jewel was taken to the operating room at Faith Hospital on the morning of January 9. There Doctor Merz, the head of the Department of Anesthesiology at the hospital, administered anesthesia by endotracheal intubation. In such procedure, the patient is placed on the operating table and a blood pressure cuff placed on one arm. A glucose solution is started dripping in the other arm. The patient is then given a dose of sodium pentothal through the intravenous drip which induces unconsciousness. The patient is also given a relaxant drug. After the relaxant drug has become effective, a laryngoscope is introduced into the patient's mouth. This instrument is described as "nothing more than a tongue depressor with a handle at one end and a small electric light bulb at the other." By the use of such instrument, the tongue of the patient is lifted to the left, out of the operator's line of vision so that the vocal cords are visible to him. When the vocal cords are visible, the operator, holding the laryngoscope in his left hand, inserts the endotracheal tube into the opening between the vocal cords.

A tube of soft rubber was employed in this case. The tubes are of varying lengths and diameters, for patients of varying ages and sizes. In use, the end inserted between the vocal cords extends to approximately 2 inches below the vocal cords and into the larynx at the opening of the trachea. The other end is, in an oral insertion, as in this case, at the patient's lips. That end is connected to the gas machine which transmits, through the tube, the anesthetic agent.

In inserting a rubber tube, such as was employed in this case, a stylet, or metal wire, is inserted into the cavity of the tube to guide it and to give it rigidity during the insertion. Such device was used in this

case. It protrudes from the end at which the operator is working and, according to Doctor Merz, the one used here is designed with a handle to prevent its protruding from the interior end of the tube. In the insertion of the tube, the end inserted into the trachea is lubricated with a sterile lubricant jelly. No pressure is required to insert the tube in place. The entire insertion procedure requires approximately 3 minutes. At the conclusion of the operation, the tube is removed by simply withdrawing it.

According to witnesses in the case, this technique is widely employed in serious operations or operations of more than an hour's duration. Doctor Merz estimated that in major surgery 75 to 80 per cent of the cases are intubated. He estimated that he had employed the technique more than 10,000 times.

In this case, a resident administered the sodium pentothal and then Doctor Merz inserted the tube. He observed the vocal cords at that time and noted no abnormality. The operation, which was performed by Doctor Benincasa, lasted approximately 2½ hours. At its conclusion, Doctor Merz removed the tube.

No witness testified to any untoward occurrence during the operation. The patient did not cough, did not vomit, or move her head. After the operation, the patient was taken to the recovery room. There she, according to the nurse's notes, "vomited some blood clots." The notes following this entry stated "(patient was intubated)."

Although Jewel testified that she first noticed a pain in her throat the day after the operation, the hospital record indicated that, some time subsequent to the operation and on the same day, Doctor Libenow, the resident who had injected the sodium pentothal in the anesthesia procedure, directed "pondets, 3–4 hours, PRN for sore throat."

On the day following the operation, Jewel complained to Doctor Benincasa concerning the pain in her throat and he made a notation in her hospital record on that date: "throat sore." She continued to complain of soreness in her throat and Doctor Benincasa, on January 12, made an entry in her record: "some hoarseness—voice." Under the date, January 18, an entry appears in her hospital record: "patient had irritation of vocal cords which has persisted. J. Merz."

According to Jewel, the pain in her throat persisted for from 3 to 5 days following the operation. After a few days, her voice became raspy and its volume was much less than it had been prior to the operation. She was discharged from the hospital on January 20.

After her discharge from the hospital, Jewel's voice continued to be weak and rasping. She apparently saw Doctor Benincasa concerning the condition of her voice on several occasions. He stated, however, that he at no time examined her vocal cords because that was "not in his line of practice." She also consulted two other doctors who specialized in diseases of the ear, nose and throat, but who did not testify at the trial.

The first examination after the operation of her vocal cords, concerning which any evidence appears, was made on June 3, 1959. At that time, Jewel was examined by Dr. William T. K. Bryan, a diplomate of the American Board of Otolaryngology and Assistant Professor of Otolaryngology at Washington University. Upon examination, Doctor Bryan found that she had a rough, hoarse voice. He observed a redness of her left vocal cord and that the movement of that cord was not complete. Doctor Bryan saw Jewel again on August 15, 1959. At that time, he made a note concerning her left vocal cord—"almost none." On March 24, 1962, Doctor Bryan again saw her. Her voice, at that time, was still hoarse and the left vocal cord remained concave, narrow in shape and at a lower level than the right. According to Doctor Bryan, the speech difficulty arose from the

defect in the size and position of the left vocal cord.

At the request of the defendant, Jewel, on April 8, 1961, was examined by Dr. Joseph Ogura, a physician specializing in head and neck surgery and reparative work, and Professor of Otolaryngology at Washington University. According to his examination, the functioning portion of the left vocal cord was bowed outward and thin, although it moved as vigorously as the right. However, when the patient "phonated, the left vocal cord did not meet the right vocal cord in the normal vibrating position; and this, obviously, created a gap in between the two functioning portions of the cord because the right was normal and the left one was thin and atrophic." He attributed the abnormality of her voice to the condition of the left vocal cord which he described.

Plaintiffs' petition charged generally that the defendant "negligently, carelessly and unskillfully administered * * * tracheal anesthesia," and thereby caused injury to plaintiff Jewel Rauschelbach's left vocal cord and impaired its functioning. Their verdict-directing instruction, after setting forth the standard of care for physicians, and hypothesizing preliminary matters, called for the jury to find for plaintiffs "if you find that in the insertion of said [anesthetic] device or devices into her trachea defendant Merz so handled or manipulated said anesthetic device or devices as to cause injury to plaintiff Jewel Rauschelbach's left vocal cord, and if you find that in so handling or manipulating said device or devices, if so, defendant Merz was negligent, and that such negligence, if any, directly or proximately caused" the injury to the left vocal cord of plaintiff.

The evidence would have fully supported a finding that the volume of Jewel's voice was diminished and that it was hoarse and rasping following the operation and at the time of trial, and that the vocal difficulties arose from the impaired functioning of the left vocal cord. The vital question on this appeal is whether or not the evidence made a submissible case on the question of defendant's negligence as the cause of the injury to the left vocal cord. The defendant asserts that it did not and that the judgment of the trial court should, therefore, be affirmed, without regard for the errors alleged by plaintiffs.

Plaintiffs acknowledge that their case is based upon circumstantial proof of the defendant's negligence. Their theory of such proof, as set forth in their brief, is as follows:

"Plaintiffs' evidence showed that her vocal cords were completely normal before the insertion of the device. Dr. Benincasa's examination before surgery proved this, as did defendant's own examination. Immediately following the surgery, she developed a sore throat and a raspy voice with low volume. Pondets were prescribed for her sore throat. She vomited blood clots which certainly could not be related to the hysterectomy.

"The only contact with her vocal cords during surgery was by means of the endothracheal tube and stylet used by defendant. There was a multitude of evidence of the capacity of this kind of device to injure a vocal cord, if used improperly. See, for example, Dr. Ogura's testimony, Dr. Benincasa's testimony and the interesting cross-examination of defendant with reference to authoritative literature on the subject.

"The evidence also showed that there was no movement of her person nor unusual occurrence during her anesthesia which would have caused the endothracheal tube to come into sudden contact with the vocal cords.

"These circumstantial facts, when coupled with the undisputed injured condition of her vocal cord after the surgery, warranted the submission to the jury of a finding that defendant

negligently inserted these devices. This finding, however, necessarily was based upon the circumstantial evidence outlined above, and not upon any direct testimony."

The standard of care imposed upon the defendant in a malpractice case has been stated as follows: "The defendant was required to use and exercise that degree of care, skill, and proficiency which is commonly exercised by the ordinarily skillful, careful, and prudent physician and surgeon engaged in similar practice under the same or similar conditions. It is not sufficient that he may have possessed the requisite training and skill; he must also have used and applied it in the treatment of the plaintiff." Steele v. Woods, Mo.Sup., 327 S.W.2d 187, 196. See also Williams v. Chamberlain, Mo.Sup., 316 S.W.2d 505, 510. That standard applies to persons who administer anesthetics in the course of medical treatment. Spain v. Burch, 169 Mo.App. 94, 154 S.W. 172; Ingram v. Poston, Mo.App., 260 S.W. 773; Mitchell v. Poole, 229 Mo.App. 1, 68 S.W.2d 833; Annotation, "Malpractice: duty and liability of anesthetist," 53 A.L.R.2d 142, 144. In malpractice actions, the plaintiff has the burden of proving defendant's failure to meet this standard of care. Telaneus v. Simpson, 321 Mo. 724, 12 S.W.2d 920, 928; Williams v. Chamberlain, Mo.Sup., 316 S. W.2d 505, supra.

As in other types of negligence cases (Maybach v. Falstaff Brewing Corp., 359 Mo. 446, 222 S.W.2d 87), the defendant's negligence in a malpractice case may be proved by circumstantial evidence. Stallman v. Robinson, 364 Mo. 275, 260 S.W. 2d 743, 749; Eichholz v. Poe, Mo.Sup., 217 S.W. 282, 284; Hilton v. Mudd, Mo. App., 174 S.W.2d 31, 36. In some types of malpractice actions, the plaintiff's case may be submitted to the jury, where he has alleged negligence generally, and the evidence has shown such an occurrence or injury as the lay juror can determine would not likely happen in the exercise of

ordinary care and skill. The most frequent cases of this type are those in which a foreign object is discovered in the patient's body following surgery. Among such cases are Null v. Stewart, Mo.Sup., 78 S.W.2d 75; Hilton v. Mudd, Mo.App., 174 S.W.2d 31, supra; Ingram v. Poston, Mo.App., 260 S.W. 773, supra; Sontag v. Ude, 191 Mo.App. 617, 177 S.W. 659. In such cases, the jury may draw the inference of negligence even in the absence of expert medical testimony as to the ordinary practice and skill in the community. Eichholz v. Poe, Mo.Sup., 217 S.W. 282; Sontag v. Ude, 191 Mo.App. 617, 177 S.W. 659. Similar consideration has been accorded plaintiffs in cases involving injuries which occurred in an area remote from the operative treatment. Reeves v. Lutz, 179 Mo.App. 61, 162 S.W. 280; Krinard v. Westerman, 279 Mo. 680, 216 S.W. 938. For further discussion of the employment of inferences in proof of negligence in malpractice, see Comment, "Malpractice Recovery in Missouri and Elsewhere upon General Negligence Allegations," 23 Mo.Law Rev. 203; Note, "The Law of Medical Malpractice in Missouri," W.U.L.Q., June, 1962, 402, 425.

Here, however, we have a case in which the average lay juror would obviously be unable, of his own knowledge and general experience, to determine whether or not the injury complained of would have happened in the absence of negligence. Although the injury was remote from the scene of the principal operation, yet the vocal cords were necessarily involved in the administration of the anesthesia, which is really the subject of this action. Therefore, we do not have a simple case of going into the operation with a healthy organ or tissue in some other part of the body, which obviously should not be involved in the operative process, and coming out with a damaged or unhealthy one. The plaintiffs obviously recognized this, for the entire thrust of their medical testimony was toward showing the unusual nature of the result in this case. Such showing was, of necessity, by medical testimony.

In determining whether or not a submissible case was made, we, of course, view the evidence in the light most favorable to plaintiffs, giving them the benefit of all favorable inferences and disregarding defendant's evidence, except insofar as it might be favorable to plaintiffs. Chailland v. Smiley, Mo.Sup., 363 S.W.2d 619; Hall v. Rager, Mo.Sup., 357 S.W.2d 83. The evidence would be sufficient to make a submissible case if a reasonable probability that the defendant was negligent may be fairly inferred from it. Steele v. Woods, Mo. Sup., 327 S.W.2d 187, 195; Lindsay v. Wille, Mo.Sup., 348 S.W.2d 1, 4; Frese v. Wells, Mo.Sup., 40 S.W.2d 652, 654. However, if under the evidence viewed most favorably to plaintiffs, the question of negligence can be determined only by resort to conjecture and surmise (Pedigo v. Roseberry, 340 Mo. 724, 102 S.W.2d 600), the plaintiffs failed to make a submissible case.

We start from the basic fact of an unquestionable injury to Jewel's left vocal cord. Prior to the intubation, she had no vocal difficulty. Thereafter, she did. The evidence excluded any contact with her vocal cords by any instrumentality during her hospitalization other than in the intubation. The testimony of Doctor Benincasa and of the defendant excluded any untoward event during the operation which might have caused injury to the vocal cords, such as coughing, a sudden jerking of the head, vomiting with the tube in place, and laryngeal spasm. The medical testimony definitely related the condition to the intubation. However, the mere fact that the injury was related to the process does not, by and of itself, prove that the defendant was negligent in inserting or manipulating the tube. Spain v. Burch, 169 Mo.App. 94, 154 S.W. 172.

Plaintiffs' medical testimony did show that, in the great many intubation cases with which their witnesses were familiar, none had seen a case in which the patient had been affected as Jewel was in this case. The defendant testified that he had con-

ducted this technique ten thousand times, but he had never seen a case such as the plaintiff's. However, plaintiffs' three medical witnesses all testified that some irritation of the vocal cords occurs from the mere presence of the tube during a lengthy operation and that a painful throat of several days' duration often occurs in intubation, without regard for the skill or care of the anesthetist.

Doctor Bryan, an otolaryngologist, was asked by way of a hypothetical question, posing the facts of Jewel's experience, whether or not he had an opinion that the condition of the cord which he found was the result of a forceful trauma or injury. His response was: "The only trauma we know—that I know of is the introduction of the tube * * * and that could have caused that condition." However, on cross-examination, it was brought out that the "injury" of which he spoke was not necessarily the result of force and that it might or might not be related to the work of the physician who inserted the tube.

When Doctor Bryan was asked whether or not he was able to say that the condition which he found was caused by things which the doctor inserting the tube had nothing to do with or the things he had something to do with, he replied, "Not quite." He explained his uncertainty on the basis that "the few larynges I have examined damaged by insertion of tubes or by having the tube in place were bilateral. They were not unilateral." However, he acknowledged that the original injury to Jewel might have been bilateral, with the right cord having cleared up prior to the time that he first saw her, six months after the operation. Doctor Ogura, also an otolaryngologist who testified for plaintiffs found no significance from the fact that the condition was unilateral. Doctor Ogura explained: "In the first place, you can have swelling on both sides and you can have changes only progress on one side depending how much it is."

Perhaps the most favorable testimony for plaintiffs came from Doctor Ogura. His

deposition was read into evidence on behalf of the plaintiffs. In the deposition, in questioning by plaintiffs' counsel, the following appears:

"Q Assume that Mrs. Rauschelbach was in a deep plane of anesthesia all throughout the presence of this tube and assume that you watched throughout the operation and that she did not cough, that she uttered no sounds, that she showed no evidence of any laryngeal spasm and that she was motionless and her conduct was uneventful, so to speak throughout the presence of the tube, would those factors tend to mitigate against this injury being from the mere presence of the tube?

"A Right.

"Q Your answer is yes?

"A It cannot cause—

"Q In that situation?

"A In that situation, it cannot cause —the tube cannot play any role at all."

Frankly, we find some difficulty in reconciling this answer with his previous testimony. He had stated: "Well, any time you have a tube down in the throat and it is down there for a long period of time, there are reactions to the tube." He described the "natural reaction" as "swelling of the vocal cords." "The vocal cords become edematous. If the vocal cords have been quite irritable during the anesthesia because of the plane of anesthesia, then, the cords are moving against it, moving against the tube and they get little hemorrhages in the vocal cords. You may have an unusual complication, a more unusual complication which is on the back half of the vocal cords, you get a so-called ulcer developing, what we call a contact ulcer developing and then it produces a lot of granulation tissue because of the cartilage destruction that is present and these are difficult to handle; but I have seen these a number of times." In response to an inquiry as to the process which resulted in the change which he

found in plaintiff, he stated: "Yes, I would say that she probably had some swelling after the operation. This swelling then was probably in the order of possibly some hemorrhages, you know, in the mucous membrane and subsequently set up some chronic inflammatory reaction and by the mere presence of that, and then as a result of this, being a little bit deeper than it has been, the muscles then which are immediately under the surface, because of its presence of swelling and interference with circulation, they then atrophied. Now, I am not going to give you the scientific reasons for it but I do know the scientific reasons for it is because these muscles are very, very delicate and they are probably one of the most delicate muscles we have in the human body next to the eye muscles of the eye which are also, very, very delicate. They don't stand a lot of trauma, either, you cannot fool around with eye muscles. They go to pot."

Perhaps the most significant part of Doctor Ogura's testimony was his statement:

"Both instances; I mean the number of times that I, personally, have seen injuries, blows, to the voice box and the number of times—the number of larynges that I examined following intubation, and they go into the thousands that I examined, this is a very, very unusual after effect. I have seen this after effect occur for no reason at all, no good reason at all. Now, it can occur from so-called nerve, muscle injuries, from unknown causes. I have seen this, because this is in an area that we know very little about. *This is the—the truth of the matter is, we are in an area that, since it is so rare, there is no possible way to study this.*" (Emphasis supplied)

As for cross-examination of the defendant, he acknowledged that, in inserting the tube, he employed a stylet to keep the tube rigid. He denied that the stylet could have protruded from the end of the tube, but that denial would not have precluded a finding to the contrary. See Ingram v. Poston, Mo.

App., 260 S.W. 773. The defendant was cross-examined concerning medical literature in which it was pointed out that "if the end of the stylet protrudes from the catheter, it may cause trauma to the vocal cords." Doctor Merz admitted that if an anesthesiologist, by the use of a stylet or catheter traumatically injures a vocal cord, he is not being careful. However, this testimony merely raises a possibility that the defendant caused the injury by careless handling of the stylet. We are still confronted with plaintiffs' medical testimony which would clearly admit of the development of Jewel's condition without any such trauma as the stylet might produce. Doctor Merz' admission that traumatic injury through handling of the stylet would involve carelessness states an obvious fact and cannot be taken as an admission that he was careless. Compare this statement with that of the defendant, held to be an admission, in Hague v. Threadgill, Mo.App., 236 S.W. 895, 897, where the defendant, according to plaintiff, stated, "I made an awful mistake—I made the mistake of my life—I have cut the boy's tongue."

We must conclude that all of the evidence in this case favorable to plaintiffs, when viewed in its most favorable light, is not sufficient to permit a determination of whether the injury was the result of the mere presence of the tube during the lengthy operation, without negligence on anyone's part, in other words, a poor result in a properly handled case, or whether it was caused by some negligence on the part of the defendant in the insertion or manipulation of the tube. As to the latter, the evidence does not rise above showing a mere possibility of such a cause. Plaintiffs' case resolves itself into one in which their medical witnesses state that they do not know just what caused the injury. In such circumstances, a jury could resolve the problem only through resort to conjecture and surmise. We do not have a conflict in testimony, in which event the jury would resolve the question as best they could. What we have here is a complete failure of proof of the essential of plaintiffs' case.

Returning to plaintiffs' analysis of their case, the evidence did show that Jewel's vocal cords were normal prior to the operation and that thereafter, she had a sore throat and raspy voice and that pondets were prescribed for her sore throat. However, plaintiffs' medical testimony clearly showed that such condition alone was not of significance from the standpoint of negligence because it frequently occurs in intubation, regardless of the skill, or lack of skill, of the anesthetist. The vomiting of blood clots could be explained, in the light of Doctor Ogura's testimony, as the result of hemorrhages in the vocal cords due to irritation from the mere presence of the tube. The blood clots would not likely have been related to the hysterectomy. This is not, however, a case of injury to an "unaffected portion of the body, i. e., one unconnected with the area of the operative treatment," or one in which the injury itself may give rise to an inference of negligence. The anesthetic procedure, which is what we are really concerned with in this case, necessarily involved the vocal cords and some adverse effect upon them was wholly to be expected.

As to the statement that the only contact with her vocal cords was by means of the tube and stylet used by defendant, there is actually no evidence that the stylet was in contact with the cords. Of course, the tube was and plaintiffs would perhaps surmise that the stylet was. However, there was no direct evidence to that effect nor any evidence from which such fact might be reasonably inferred. Admittedly, the evidence showed that such instruments had the potential capacity for injury to the vocal cords.

Indeed, there was no evidence of anything untoward during the operation. However, we cannot overlook the medical testimony that the breathing by the patient with the tube in place is sufficient, by and of itself, to cause irritation and injury.

We must disagree with plaintiffs that circumstantial evidence warranted a finding of negligence on the part of defendant. We conclude that it did not. So finding, we need not consider the plaintiffs' assignments of error. Bello v. Stuever, Mo.Sup., 44 S.W. 2d 619, 620.

The judgment of the trial court is affirmed.

COIL and HOUSER, CC., concur.

PER CURIAM.

The foregoing opinion by WELBORN, C., is adopted as the opinion of the Court.

All of the Judges concur.